**FILED**

December 08, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ cap
                        DEPUTY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

---

LARRY GOLDEN,

     Plaintiff,

     V.

GOOGLE LLC

     Defendants.

---

CASE NO: 6:25-cv-00434-LS

**JURY TRIAL DEMANDED**

**(Joint Patent Infringement)**
**(Direct Patent Infringement),**
**(Willful Patent Infringement),**

December 4, 2025

# PLAINTIFF'S RESPONSE TO DEFENDANT GOOGLE MOTION TO

# DISMISS AND PLAINTIFF'S CROSS MOTION FOR

# PERMANENT INJUNCTION RELIEF

This case was brought to this Court because twelve Federal Judges (three District Court Judges and nine Federal Circuit Judges) determined infringement of Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) devices (i.e., smartphones, laptops, cell phones, PDA's, PCs, tablets, etc.), occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Plaintiff alleged in this complaint that the Google smartphone (i.e., mobile device); the Google smartwatch (i.e., consumer device); and Google's CPU (i.e., cellular device); when integrated with, or interconnected to, a CBRNE-H detection capability, infringes Plaintiff's patented inventions.

For purposes of alleging and proving this infringement theory, Plaintiff have narrowed the complaint to the "Google Tensor CPU/Chipset Series (i.e., cellular devices); when integrated with, or interconnected to, a CBRNE-H detection capability, infringes Plaintiff's patented inventions".

Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), plaintiff have alleged facts that give rise to "more than a sheer possibility that a defendant (Google) has acted unlawfully." *Iqbal*, 556 U.S. at 678. Plaintiff have also pled "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant (Google) is liable for the misconduct alleged."

2

## Plaintiff's Supporting Patent Claims for the Alleged Infringing Combination

### U.S. Patent No: 9,589,439

23. A cell phone comprising:

a central processing unit (CPU) for executing and carrying out the instructions of a computer program;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone

### U.S. Patent No: 10,163,287

4. A communication device comprising:

at least one central processing unit (CPU);

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals … to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

5. A monitoring device, comprising:

at least one central processing unit (CPU);

one or more detectors in communication ·with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals … to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

6. A monitoring equipment, comprising:

at least one central processing unit (CPU);

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; ·

3

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals ... to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

**U.S. Patent No: 10,984,619**

1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

6. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

7. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

11. A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

16. The central processing unit (CPU) of claim 11, capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

17. The central processing unit (CPU) of claim 11, capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

Google is quoted in its Motion to Dismiss "[t]he asserted '619 and '287

patents include only system claims...".  Which means in theory, when the time

comes, Plaintiff need only show how the alleged infringing Google Tensor CPU/Chipset is "*capable of*" directly infringing Plaintiff's patented CPU invention.

First, capability claiming [claims 1 & 11 of Plaintiff's '619 patent asserted in this case] is a direct infringement doctrine that pertains to article claims (systems, apparatuses, computer program products, and the like) for which a functionally recited element is literally present in the accused article. Plaintiff has plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant [Google] is liable for the misconduct alleged. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant [Google] has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) …

Second, to satisfy an intended use limitation which is limiting, a prior art structure which is "*capable of*" performing the intended use as recited in the preamble meets the claim. *See*, e.g., *In re Schreiber*, 128 F.3d 1473, 1477, 44 USPQ2d 1429, 1431 (Fed. Cir. 1997)

The Northern District of California Court never adjudicated a "*capable of*" infringement or "*use*" infringement claim on Google's alleged infringing Tensor CPU/Chipsets. Therefore, it is highly improbable a final judgement was ever entered. Without a final judgement, Google's claims of issue and claim preclusion; plus, *Kessler* are "moot" defenses in this case. Google failed to show, or prove, the twelve federal judges determination of when infringement occurs, is wrong.

**Twelve Federal Judges Repeatedly Confirmed Google's Arguments that the Integration of a CBRNE-H Detection Capability with a Mobile Device; Infringes Plaintiff's patented CMDC Invention**

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

*The United States Court of Appeals for the Federal Circuit Judges in Golden v. Google, LLC, Case No. 22-1267; determined Direct Infringement by or for the Government, arises when there's a combined ATAK Software; CBRN Plugins; CPU; and [Google] Smartphone*

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to

say: "In the Google case, the district court ***again*** concluded that Mr. Golden's

complaint was frivolous. Here, however, Mr. Golden's complaint includes a

detailed claim chart mapping features of an accused product, the Google [Pixel 5]

Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439,

and 9,069,189" … "to the extent that the chart includes the "exact same language"

as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

*The United States Court of Appeals for the Federal Circuit Judges in Golden v. Samsung Case No. 23-2120; agreed with the Northern District of California Court Judge in Golden v. Samsung that Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and [Google] Smartphone*

In *Golden v. Samsung Electronics America, Inc*. Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1)

through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

8

"We reject Mr. Golden's appeal arguments and therefore affirm the district

court's dismissal of his complaint."

*The Northern District of California Court Judge Haywood S. Gilliam, Jr. in Case*
*No. 22-5246; determined Direct Infringement by or for the Government arises*
*when there's a combined ATAK Software; CBRN Plugins; CPU; and [Google]*
*Smartphone*

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order

Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23;

the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant

[Google] that the Google Pixel devices could only infringe Golden's asserted

patents if a user were to add the additional ATAK application and CBRN plugins.

*The Northern District of California Court Judge Rita F. Lin in Case No. 22-5246;*
*determined Direct Infringement by or for the Gov't arises when there's a combined*
*ATAK Software; CBRN Plugins; CPU, and [Google] Smartphone*

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order

Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68

Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant

[Google] that the Google Pixel devices could only infringe Golden's asserted

patents if a user were to add the additional ATAK application and CBRN plugins.

*The United States Court of Appeals; Federal Circuit Judges in Golden v. Google,*
*LLC, Case No. 24-2024; determined infringement occurs when a [Google] mobile,*
*consumer, or cellular device is integrated with, or interconnected to, Draper's*
*CBRNE detection capability.*

In *Golden v. Google LLC.*, Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

**Under this infringement theory, Google's alleged direct infringement reaches across three different jurisdictions:**

First, under 35 U.S.C. § 271(a): Divided or joint infringement will only be relevant to direct infringement claims. Divided patent infringement—also called "joint infringement"—is a doctrine Plaintiff is using to allege Google's

infringement under 35 U.S.C. § 271(a) in this District Court where more than one party is participated in a patent's claimed steps. In *Muniauction v. Thompson Corp.* 532 F.3d 1318 (Fed. Cir. 2008), "[w]here the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'" Google allegedly "exercises control or direction over the entire process of "joint infringement" with its Google android open-source operating system and the source code Google releases for developers, engineers, or programmers to build upon.

Second, under 28 U.S.C. § 1498(a): According to a contracting officer instructions or specifications or drawings which impliedly sanction and necessitate infringement" *Hughes Aircraft Co.*, 534 F.2d at 901; that the Government [DoD-DTRA]; in its Broad Agency Announcement on 05/07/2019; Defense Threat Reduction Agency BAA Call CBI-01 HDTRA1-19-S-0005 Chemical / Biological Technologies; the DoD-DTRA request in the solicitation's specifications, "ATAK, … that is: "Mobile [software] applications for lightweight and transportable devices such as Google smartphones and tablets, that enable the Warfighter to operate under the threat of Chemical and Biological threats." The Android Tactical Assault Kit (ATAK) is built on the Google Open-Source Operating System platform. ATAK has a CBRNE plugin architecture. ATAK is built on Google's

android open-source operating system. Draper Laboratory, Inc. is responsible for providing the CBRNE plugin sensors [hardware]. Also, the ATAK itself has various end-user versions: ATAK - Civilian (ATAK-CIV); ATAK - Government (ATAK-GOV); and, ATAK - Military (ATAK-MIL). Under 28 U.S.C. § 1498(a), the U.S. Court of Federal Claims reviews direct infringement liability claims, only.

Third, under the International Trade Commission (ITC) Section 337 and 35 U.S.C. § 271(g): Google, a respondent in an ITC investigation (Inv. No. 337-TA-1191) teed up a challenge at the Federal Circuit to *Suprema's* holding, in anticipation of the potential reversal of *Chevron* by the Supreme Court. *See Sonos v. ITC*, No. 22-1421, Dkt. No. 98 at 9 (arguing that "*Suprema* cannot survive" if *Chevron* is reversed). Google's case involved similar facts to those present in *Suprema*, and Google argued that Section 337 violations should be interpreted narrowly to only address articles that infringe at the time of importation, and not infringing acts after importation. While Section 271(a) of the patent statute relates to direct patent infringement, Section 271(g) imposes liability based on importing materials made via processes protected by U.S. patents. But as the Federal Circuit recently clarified, Section 271(g) is not subject to the same single entity requirements as 271(a). The Federal Circuit in *Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344 (Fed. Cir. 2019). The Federal Circuit found that Section 271(g) thus did not require a single entity to perform the steps of a

patented process to give rise to infringement liability. *Willowood* argued that Section 271(g) was another form of direct infringement, which requires a single entity to perform all steps. The Federal Circuit disagreed. In Section 271(g), liability arises once the product is imported, not when the material was manufactured with the patented process. Under Section 337 Google imports its smartphones and CPUs [articles covered by patents]; and under Section 271(g) Google imports its smartphones and CPUs [materials covered by patents]; but infringement of Plaintiff's patents occurs post-importation.

In the wake of the Supreme Court's elimination of "*Chevron* deference" in the *Loper* decision, many commentators have suggested that the ITC's authority over unfair imports under Section 337 might be curtailed. *See Loper Bright Enterprises v. Raimondo*, 2024 U.S. LEXIS 2882 (June 28, 2024). Most prominently, some have worried (or hoped, depending on their point of view), that the Federal Circuit's decision in *Suprema*, which affirmed the ITC's authority to find a Section 337 violation based on post-importation infringing activity, could be overturned. *See Suprema v. ITC*, 796 F.2d 1338 (Fed. Cir. 2015) (*en banc*).

These concerns were not totally baseless, as the *en banc* decision in *Suprema* explicitly relied on *Chevron* in affirming the Commission's interpretation of its statutory authority. 796 F.3d. at 1340-41 ("the Commission's interpretation of Section 337 is entitled to *Chevron* deference [and] is reasonable because it is consistent with Section 337 and Congress' mandate to the

Commission to safeguard United States commercial interests at the border"). Indeed, earlier this summer, in a petition for re-hearing at the Federal Circuit, Google, a respondent in an ITC investigation (Inv. No. 337-TA-1191) teed up a challenge at the Federal Circuit to *Suprema's* holding, in anticipation of the potential reversal of *Chevron* by the Supreme Court. *See Sonos v. ITC*, No. 22-1421, Dkt. No. 98 at 9 (arguing that "*Suprema* cannot survive" if *Chevron* is reversed). Google's case involved similar facts to those present in *Suprema*, and Google argued that Section 337 violations should be interpreted narrowly to only address articles that infringe at the time of importation, and not infringing acts after importation. *Id*. at 10-13.

However, as the authors of this article previously noted, the *Loper* decision explicitly stated that prior decisions that relied on *Chevron* remain subject to statutory stare decisis. *See Loper* 2024 U.S. LEXIS 2882 at *60-61. So, with Google's challenge, it remained uncertain whether the Federal Circuit would take Google's invitation to reconsider *Suprema*, and if it did, whether it would reach a different result absent the Chevron framework of agency deference.

With this week's ruling by the Federal Circuit, the wait is now over, and *Suprema* remains good law. On September 10th, the Federal Circuit denied Google's petition for rehearing and rehearing *en banc*. Order on Petition for Rehearing *En Banc*, Fed. Cir. Case No. 22-1421 (Sept. 10, 2024). By Mintz | Oct 14, 2024

https://www.premierappellatelawyers.com/news-publication/federal-circuit-rejects-googles-bid-to-shrink-itc-jurisdiction-over-post-importation-acts-of-indirect-infringement/

**Plaintiff's "patent infringement" claims are issues-of-facts to be tried by a jury [U.S. CONS'T 7th Amend.]**

The Courts allowed Google to improperly reverse claim construction for the term "built-in, embedded" that was decided at the PTAB; which extends to devices that were not only internal the Google smartphone, but external the Google smartphone as well. In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Google and the Courts reversed without a claim construction hearing because Google was without a "term" or "phase" to construe that justifies adding the term "modification".

In other words, "built in, embedded", when applied to smartphone devices, covers the various connectivity or communication means of the device, such as connecting through software, NFC, GPS, RF, satellite, cellular, internet, Bluetooth, Wi-Fi, etc.

In the Northern District of California Court, Google challenged the above facts and argued that each one of Plaintiff's theories of infringement was only accomplished by modification. Modification made possible by software, NFC, Bluetooth, GPS, and WI-Fi.

Although the PTAB did not literally describe modification ["modified", "such that it is an integral part of the device"], as a construed term for "built in, embedded". Google did the honors; which means Google performed the task of proving direct, and/or joint infringement for Plaintiff.

Plaintiff practically begged the Northern District of California Court to allow Plaintiff the opportunity to present these issues-of-fact to a jury; only to be denied Plaintiff's guaranteed seventh amendment right to a trial by jury for patent infringement claims that are issues-of-fact.

Simply put, if Google's defense theory of modification is valid; it invalidates the over 300,000 patents owned by Qualcomm for wireless technology. Example: when the Google smartphone is taken out of the box, it lacks the ability to function as a wireless device until a wireless carrier i.e., AT&T, Verizon, T-Mobile, "modifies" the Google smartphone to function as a wireless device. Without the modification, AT&T, Verizon, and T-Mobile cannot offer certain wireless communication means such as NFC, GPS, RF, cellular, Bluetooth, and Wi-Fi.

**In this Current Case a Jury will Decide the Difference Between Google's Infringing Use of a Patented Method or Process from Google's Infringing Use of a Patented System or Device—Not Modification**

The use of an infringing device/apparatus typically refers to the utilization of devices or systems that violate intellectual property rights, particularly patents. This can lead to legal consequences for Google. Using a device/apparatus that

incorporates Plaintiff's patented technology without permission constitutes patent infringement.

Case law appears obvious: "[T]he use of a patented invention, without either manufacture or sale, is actionable." "The inventor of a machine [device/apparatus] is entitled to the benefit of all the uses to which it can be put, no matter whether the inventor had conceived the idea of the use or not."

Rules governing use infringement depend on the nature of the claim-in-suit. Infringing use of a patented method or process is fundamentally different from infringing use of a patented system or device. For example, a rule that governs infringement of a method claim may not govern infringement of an apparatus or device claim.

The critical factor for determining which type of use infringement has occurred is whether the patent claim covers a process and not the apparatus itself used to implement that process.

"[A]pparatus claims cover what a device is, not what a device does." Any use of a device that meets all of the limitations of an apparatus claim clearly infringes. Mere possession of a product covered by a subsequently issued patent, however, does not infringe until the product is used, sold or offered for sale.

A process, however, is a different kind of invention. It consists of acts or steps, rather than tangible things. A process, therefore, has to be carried out or

performed. Thus, a process/method claim is directly infringed only if each step of the claimed method is performed.

Importantly, the sale of an apparatus capable of performing the patented method is not a sale of the method. A method claim is directly infringed only by the entity usurping the patented method.

Google is attempting to misguide this Court the same as Google did in the Northern District of California Court. Google will have this Court believe the alleged infringing smartphone device is the patented product of Google and the other OEMs, and Plaintiff's is attempting to modify the OEMs devices to conform to the limitations of Plaintiff's patent claims.

When in fact, it is Google and the other OEMs who has allegedly duplicated Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device that was filed at the USPTO at least three years prior to Apple releasing the first smartphone in 2007.

In 2008, Apple is believed to have entered into a cooperative agreement with the Department of Homeland Security (DHS) for the assembly and commercialization of a mobile device that has CBRNE detection capability.

Apple was sure to follow the specifications of the DHS because Apple knew, or should have known, that Apple is immune from infringement liability as long as the company is performing work for the Government. Google designed after Apple

**Plaintiff's "notice pleadings" that Google/Waymo's Alleged Infringement Satisfies the Pleading Standard set forth in the Federal Rules of Civil Procedure**

"Notice pleading refers to pleading standards that merely notify the opposing party and court of the general issues in the case. In contrast to fact pleading standards, notice pleading standards do not require pleadings to include hyper-detailed facts in support of each claim. Notice pleading rejects the rigid approach that pleading is a game of skill—that requires precision and particularity—in which one mistake by counsel at the pleading stage may be decisive to the claim's outcome; instead notice pleading relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."

"The Federal Rules of Civil Procedure and majority of state courts use the notice pleading standard. However, notice pleading jurisdictions vary in the exact level of factual detail required in pleadings. For example, Rule 8 (a)(2) of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has interpreted this language to mean that the pleading must contain sufficient factual allegations to make the pleader's right to relief "plausible." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Some have argued that the federal "plausibility" standard is too demanding and unduly prevents some plaintiffs from discovery devices that would unearth important facts."

Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant [Google/Waymo] has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … the Federal Circuit court has explained that a plaintiff … must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant [Google/Waymo] is liable for the misconduct alleged."

Based on the Plaintiff, *ProSe* Larry Golden's, limited opportunity to present facts generated from discovery, Plaintiff was able to find a *Forbes* article published June 3, 2025 that defines how Google and Waymo, in part, operates as a single unit:

> "Waymo's cash burn makes any forced separation of Waymo from Google - a question of Waymo's survival … As Waymo's growth accelerates, a new challenge could be looming in the form of the U.S. Department of Justice's ongoing antitrust lawsuit against Alphabet, which might result in the DOJ ordering a breakup of Alphabet's sprawling portfolio. Granted, the DOJ's antitrust lawsuit primarily targets Google's dominant position in the search and advertising space. But on a core level, the department might be focusing on how Alphabet's current organizational structure helps it cement its overall dominance. See how Google's Revenues have been trending. That puts units like Waymo directly in regulators' sights, given that it is a loss-making business that benefits from Google's capital, shared intelligence and analytics, and Google's deep trove of data. There are ways that Waymo drives Google's long-term strategy as well - think real data collection, AI advancement.

The money-losing rides might also be seen as costly R&D spending that generates valuable real-world data. This is why Google continues to fund the company despite mixed economics. If Waymo is forced to separate from Google as its business continues to gain commercial traction, it risks losing out on its hard-won lead."

*Trefis Team [Forbes] Published on Jun 03, 2025, 08:04am EDT and Updated on Jun 05, 2025, 01:36pm EDT. Waymo To Separate From Google?* https://www.forbes.com/sites/greatspeculations/2025/06/03/waymo-to-separate-from-google/

Alphabet Inc.'s (GOOG) (GOOGL) patience, deep pockets and technical capabilities are now on the verge of creating real shareholder value through the company's Waymo subsidiary. Despite large doubts about the technical and financial viability of robotaxis, Waymo is in the process of scaling up its commercial operations and could begin contributing to Google's bottom line within the next few years. Google's self-driving project was renamed Waymo in 2016 and spun out, although Google retains ownership.

https://seekingalpha.com/article/4726910-google-waymo-is-too-small-to-move-the-needle

Plaintiff have the patent rights for a new, improved, and useful central processing unit (CPU) for at least the new, improved, and useful cell phone, smartphone, etc. Plaintiff also have the patent rights for a stall, stop, and vehicle slow-down system for at least the autonomous, driverless, or self-drive vehicles for levels 1-4 of the DOT scale for readiness. Neither, adjudicated in the NDC court.

## PLAINTIFF'S CROSS-MOTION FOR PERMANENT INJUNCTION RELIEF

Plaintiff asked Google's defense on Thursday, December 4, 2025 if Google will oppose Plaintiff's cross-motion for permanent injunction. Google's defense said they will oppose.

Plaintiff's motion for injunction relief is timely because twelve Federal Judges (three District Court Judges and Nine Federal Circuit Judges) determined infringement of Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) devices (i.e., smartphones, laptops, cell phones, PDA's, PCs, tablets, etc.), occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. These determinations or decisions were issued as a "final judgement" in multiple cases were a mobile device integrated with a CBRNE-H detection capability was at issue.

A permanent injunction is a court order requiring Google to do or cease doing a specific action that is issued as a final judgment in a case. This court will issue a permanent injunction only where money damages will not suffice [Google's estimated money damages exceed $100 billion dollars]. Failure to comply with an injunction may result in being held in contempt of court, which in turn may result in either criminal or civil liability.

There is a balancing test that courts typically employ in determining whether to issue an injunction. The Supreme Court in *Weinberger v. Romero-Barcelo* laid

out a four-step test that a plaintiff must pass to obtain a permanent injunction: (1) that the plaintiff has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury; (3) that the remedy in equity is warranted upon consideration of the balance of hardships between the plaintiff and defendant; and (4) that the permanent injunction being sought would not hurt public interest.

To satisfy Plaintiff's obligation to pass the Supreme Court's four-step test, Plaintiff have attached copies of Plaintiff's ITC Section 337 complaint to exclude Google's smartphones, smartwatches, NEST CO detectors, megapixel cameras, and CPUs. Attached as Exhibits are:

*Exhibit A:* Plaintiff's ITC Section 337 Letter to the Secretary to the Commission

*Exhibit B:* Plaintiff's ITC Section 337 Statement on the Public Interest

*Exhibit C:* Plaintiff's ITC Section 337 Complaint against Google and Verification

*Exhibit D:* Amicus: Statement of Interest of the United States of America

*Exhibit E:* Amicus: Joint Comment on the Public Interest of the United States Patent and Trademark Office & the United States Department of Justice

*Exhibit F:* Technical and Economic Prong—Charts and Descriptions

In *eBay, Inc. v. MercExchange, LLC*, the Supreme Court further clarified that the decision to grant or deny permanent injunctive relief is an act of equitable discretion by a U.S. district court.

**1% of Google's Cash Reserves Settles the Case**

Plaintiff also asked Google's defense on Thursday, December 4, 2025 to present to their client Google, Plaintiff's proposed early settlement of 1% of Google's cash reserves estimated at $126B (settlement total is $1.26B). Google's enormous cash reserves allow Google to invest in new projects, acquire other companies, and weather financial storms.

*Google Holds More Cash Than Microsoft, Apple and Meta Combined*

Across Big Tech, cash conveys power – enabling market leaders to snap up startups and steer the future of technology. How does Google's monetary muscle compare against rival tech titans?

- Google – $118 billion
- Microsoft – $111 billion
- Apple – $62 billion
- Meta – $53 billion

Google possesses well over double the cash reserves of any other tech peer. For perspective, Google could acquire American industrial giants like Boeing or

Deere & Company outright with the over $100 billion in its coffers. Crunching the numbers further:

- Google alone holds 29% of the total $400 billion cash pile held by Microsoft, Apple, Meta and itself
- Alphabet's cash reserve constitutes nearly 6% of all cash held by S&P 500 companies

This staggering weight of money propels Google's market value over the $1.6 trillion mark – cementing its status as one of the world's most valuable firms.

https://www.historytools.org/companies/how-much-cash-does-google-really-have

*Google's Financial Firepower Dwarfs Entire Industries*

To fully grasp the sheer scale of Google's cash stockpile, let's compare it to the annual revenues of entire industries:

- Larger than the global video game industry's $178 billion in 2021 revenues
- More than the $100 billion in annual revenues for the global bicycle industry
- Nearly triple the airline industry's 2021 total revenue of $42.2 billion

Google's cash reserves even exceed the annual R&D spending of every automotive company combined – which totaled $100 billion in 2021 according to Statista.

https://www.historytools.org/companies/how-much-cash-does-google-really-have

*Google's Liquid Assets Swell to Over $118 Billion*

Google's parent company Alphabet reported robust Q2 2023 earnings, including $74.6 billion in consolidated revenue. After subtracting operating costs, Google pocketed $19.5 billion in net income last quarter. Much of those profits flowed into Google's already-gargantuan cash reserves. As of June 30th 2023, Google possessed:

- $118.33 billion in cash, cash equivalents, and marketable securities
- This war chest has grown 12% from $105.7 billion in Q2 2022
- Highly liquid assets able to be deployed for acquisitions, R&D, and more

Bolstered by Google Cloud's first-ever quarterly profit, CFO Ruth Porat confirmed they will "continue investing aggressively" across Google's vast tech stack from search to quantum computing.

Flush with over $118 billion in dry powder, Google truly has unlimited budget to place bold bets in promising technologies before opponents can react.

https://www.historytools.org/companies/how-much-cash-does-google-really-have

*Understanding Google's Massive Cash Reserves*

Google's massive cash reserves are a fascinating topic. The company has a staggering $121 billion in cash and cash equivalents, which is more than the GDP of many countries. This enormous cash hoard allows Google to invest in new projects, acquire other companies, and weather financial storms. Google's cash

reserves are a result of its incredible profitability, with the company generating over $40 billion in operating income in 2020 alone.

Google's parent company Alphabet has a massive cash reserve of over $109 billion, which is more than $100 billion. This cash hoard is a significant amount that could be used to reward patient investors with more cash. Google has $100B in cash. Google's owner Alphabet ended last year with more than $109 billion in cash. That's a massive amount of money, and it's not being put to use. Alphabet didn't mention paying a dividend in its latest results.

Big Tech companies, including Google, have a significant amount of cash reserves. Slightly under $1.2trn is the estimated total cash and cash equivalents balance if they hadn't returned so much to investors in recent years.

This number is substantial and represents the amount of cash these companies have had to play with in recent years. Of course, some of these firms have been buying back stock in the years before, which could make the number even bigger.

Companies like Alphabet Inc. (GOOGL) and Apple Inc. (AAPL) have billions in cash reserves. Alphabet Inc. now holds $117 billion in cash, surpassing Apple Inc. which has $102 billion in liquid reserves, net of debt. Corporate America held $2 trillion in cash as of March 2022, a 7% decrease from the record $2.15 trillion at the end of 2020.

Alphabet now holds $117 billion in cash; surpassing Apple's $102 billion in liquid reserves. This significant shift in cash reserves has sparked concerns about Alphabet's dominance in the market and its potential impact on shareholders and regulators.

https://www.cgaa.org/article/google-cash-reserves

*AI Summary—Google's Cash Reserves*

Google maintains substantial cash reserves, which have evolved significantly since the company's inception.

Cash Reserves Overview:

- As of 2023, Alphabet Inc. (Google's parent company) reports cash and cash equivalents exceeding $100 billion.
- The company has consistently increased its cash reserves over the years, reflecting strong revenue growth and profitability.

Historical Context:

- In 2004, Google went public with an initial cash reserve of approximately $1.67 billion.
- By 2010, cash reserves had grown to around $33 billion, driven by increasing ad revenues and diversification into other services.
- In 2020, reserves reached about $121 billion, bolstered by the surge in online services during the COVID-19 pandemic.

Strategic Use of Cash:

- Google uses its cash reserves for acquisitions, investments in technology, and research and development.

Market Position:

- Google's cash reserves provide a competitive advantage, allowing for flexibility in strategic initiatives and resilience during economic downturns.

Sources:

- Financial reports from Alphabet Inc.
- Market analysis from reputable financial news outlets.

Currently, Plaintiff alleges Google in directly infringing; jointly infringing; infringing under the doctrine of equivalents; and, willfully infringing.

A settlement here, of 1% of Google's cash reserves settles the pending patent infringement litigation in this Western District of Texas Court—Waco Division in *Golden v. Google LLC*, Case No. 25-0434.

Therefore, the requested remedies do not pose any public health, safety, or welfare concerns, and Google have the opportunity to settle before Plaintiff's request for exclusion is ever granted; from Google's enormous cash reserves.

**Relief Requested**

Issue a permanent injunction order prohibiting Google, its domestic subsidiaries, related companies, and agents from engaging in the distribution, offering for sale, sale, use after importation, sale after importation, and other transfer within the United States of Google products that infringe one or more claims of the Asserted Patents, including, for example, the Google Pixel 8, 8 pro, 9, 9 pro, 10, 10 pro, and the Pixel 8, 9, and 10 Fold smartphones; the Google

Megapixel Cameras; and, the Google Tensor CPU/Chipsets that are embedded in each of Google smartphones.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution.

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## **VERIFICATION**

### **Pursuant to 28 U.S.C. § 1746**

I, Larry Golden, over the age of 18, competent to testify, and having firsthand knowledge of the facts stated herein, do hereby declare, certify, verify, affirm, and state under penalty of perjury under the laws of the United States of America, that the foregoing statements are true, correct, and complete to the best of my understanding, knowledge, and belief, and made in good faith.

Executed and signed this 4th day of December, 2025, with all rights reserved and without recourse and without prejudice; is this "verification" for "Plaintiff's Response to Defendant Google Motion to Dismiss and Cross-Motion for Permanent Injunction Relief".

s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-992-7104

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 4th day of December, 2025, a true and correct copy of the foregoing "Plaintiff's Response to Defendant Google Motion to Dismiss and Cross-Motion for Permanent Injunction Relief", was served upon the following Defendant via e-mail:

Brian C. Banner (State Bar No. 24059416)
Valerie Barker (State Bar No. 24087141)
SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1650
Austin, Texas, 78701
+1 (512) 402-3569
+1 (512) 402-6865
facsimile bbanner@sgbfirm.com
vbarker@sgbfirm.com


<u>s/</u> *Larry Golden*

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-992-7104



**Retail**

U.S. POSTAGE PAID
PME
GREENVILLE, SC 29616
DEC 05, 2025

UNITED STATES
POSTAL SERVICE®

76701

**$96.35**

**RDC 07**

S2324K504191-33

GUARANTEED
★ TRACKED ★
INSURED

Label 127R, May 2014

UNITED STATES
POSTAL SERVICE®

For Domestic and International Use

Office DE

8.5 in x 11 in | 3

**UNITED STATES POSTAL SERVICE®**

**PRIORITY MAIL EXPRESS®**

EI 935 866 603 US

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)    PHONE 864-288-5605

LARRY GOLDEN
740 WOODRUFF RD
#1102
GREENVILLE, SC 29607

**RECEIVED**
DEC 11 2025

**96**

**PAYMENT BY ACCOUNT (if applicable)**
Federal Agency Acct. No. or Postal Service™ Acct. _____

**ORIGIN POSTAL SERVICE USE ONLY**

| ☐ 1-Day | ☑ 2-Day | ☐ Military | ☐ DPO |

PO ZIP Code: 29615
DISTRICT COURT OF TEXAS CITY CLERK

Date Accepted (MM/DD/YY): 12/5/25

Scheduled Delivery Date (MM/DD/YY): 12/8/25

Scheduled Delivery Time: ☐ 6:00 PM

Postage: $ 96.35

Insurance Fee: $

COD Fee: $

**DELIVERY OPTIONS (Customer Use Only)**

☒ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)    PHONE 254-750-1501

U.S. DISTRICT CLERK'S OFFICE - WACO
CASE NO: 25-0434
800 FRANKLIN AVE., ROOM 380
WACO, TEXAS
ZIP + 4® (U.S. ADDRESSES ONLY)
76701-

Time Accepted: 1040  ☑ AM  ☐ PM

Special Handling/Fragile: $

Weight: 6 lbs 2 ozs  ☐ Flat Rate

Scheduled Delivery Time: ☐ 6:00 PM

Return Receipt Fee: $

Live Animal Transportation Fee: $

Sunday/Holiday Premium Fee: $

Total Postage & Fees: $ 96.35

Acceptance Employee Initials: 3

Total Postage & Fees: $ 96.35

**DELIVERY (POSTAL SERVICE USE ONLY)**

Delivery Attempt (MM/DD/YY)  Time  ☐ AM ☐ PM    Employee Signature

Delivery Attempt (MM/DD/YY)  Time  ☐ AM ☐ PM    Employee Signature

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

LABEL 11-B, NOVEMBER 2023    PSN 7690-02-000-9996

FAST
COLOR
VIVID COLORS

◁ **PEEL FROM THIS CORNER**