# Exhibit A

Larry Golden

740 Woodruff Road #1102
Greenville, S.C. 29607
Tel.: (864) 992-7104
E-mail: atpg-tech@charter.net

November 24, 2025

The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, SW, Room 112A
Washington, DC 20436

Re: ***Certain Smartphone Devices and Components, Thereof, Dkt. No. 337-TA-*** ___

Dear Secretary Barton:

When it comes to importation, a product might not actually infringe any patent when it enters the U.S., but may later be used in an infringing manner within the U.S. Section 337 of the Tariff Act of 1930 makes it unlawful to import "articles that infringe" a valid U.S. Patent.

In *Suprema, Inc. v. International Trade Commission*, the question was whether Section 337 authorizes the ITC to block the importation of goods that, after import, "are used by the importer to directly infringe at the inducement of the goods' seller." The ITC argued that it can block such goods, and the Federal Circuit ultimately agreed.

The Federal Circuit found that the ITC's interpretation of Section 337 was reasonable, explaining:

The Commission's interpretation recognizes that ***the acts necessary for induced infringement, including acts of direct infringement***, may not occur simultaneously at the time of importation. In many

cases, such acts cannot occur at the time of importation. In that context, the Commission's interpretation that Section 337 grants [it] authority to prevent importation of articles that have been part of inducement as an unfair trade act is consistent with the statutory phrase "articles that infringe."

The opinion states that the ITC's interpretation is consistent with the "fundamental purpose" of the Tariff Commission to "prevent a diverse array of unfair methods of competition in the importation of goods." It also emphasizes that "the practical consequence would be an open invitation to foreign entities … to circumvent Section 337 by importing articles in a state requiring post-importation combination or modification before direct infringement could be shown."

The *Suprema* opinion is noteworthy; it makes clear that the importation of goods can be blocked if the goods are later to be used in an infringing manner in the U.S. at the inducement of the seller.

## Complainant's IPR Final Written Decision [built-in, embedded]

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

2

> No party challenges these constructions. Both of these terms were modified
> or removed in the amendment. To the extent that any of these constructions remain
> relevant after the amendment, we see no reason to modify them.
>     We further determined that no explicit construction was necessary for any
> other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we
> see no need to construe any other terms.

Golden will continue to argue the alleged infringing Google smartphone devices are *"configured to"* communicate, monitor, detect, and control (CMDC), and more specifically argue that the Google smartphone devices are *"configured to"* function as a sensing device in at least the methods asserted in this case, that includes the Google smartwatch.

In *Core Wireless Licensing, S.A.R.L. v. LG Electronics, Inc.*, the Federal Circuit affirmed summary judgment that a claim for a "computing device *configured to* display" claimed patent eligible subject matter.  Nos. 2016-2684 & 2017-1922 (Jan. 25, 1988 Fed. Cir.). (the Federal Circuit held that the claims "were directed to an improved user interface for computing devices).

> The asserted patents disclosed improved display interfaces for
> small screens, such as mobile telephone screens. Based on the
> patent specification, the Federal Circuit held that the claims
> disclosed an improved user interface for electronic devices. The
> Federal Circuit put much emphasis on the fact that the claim recited
> a particular manner and provided an improvement over the art.

## Google's Indirect Infringement [Induced and Contributory]

Google's acts necessary for induced infringement, including "acts of direct infringement, [does] not occur simultaneously at the time of importation ... [i]n many cases, such acts cannot occur at the time of importation" See *Suprema, Inc. v. International Trade Commission.*

It is alleged Google induces infringement with the announcements and advertisements of its Google Android Open-Source Operating System's Source Code.

After importation, developers, programmers, etc. build on the Google android source code, for enabling certain articles to be interconnected to, or integrated with the Google smartphone for at least that of CBRNE-H sensing.

Judge Braden, in the United States Court of Federal Claims, *Golden v. United States*, Case No. 13-307C "Memorandum Opinion and Order Denying the Government's Motion to Dismiss, Dkt. 94, filed 11/30/16, fully described when a product is considered "manufactured" and is "suitable for use". In *FastShip, LLC v. United States*, the U.S. Court of Appeals for the Federal Circuit held that to be "manufactured" under 28 U.S.C. Section 1498, an accused product must include each claim limitation so it is "suitable for use".

"The February 12, 2016 Amended complaint identifies over thirty devices that were developed or procured, as a result of Government solicitations, Government contracts, or National Science Foundation ("NSF") grants. 2/12/16 Am. Compl. at ¶¶ 68-127. The relevant devices are: M-Lock; High-Power Electromagnetic System ("HPEMS"); Smartphone Microscope; Biophone; Smartphone Biosensor Cradle; iPhone Biodetector Smartphone; Pathtracker; the Center of Integrated Nanomechanical Systems ("COINS") Nano-Embedded Sensors; Smartphone-Based Rapid Diagnostic Tests; Lockheed Martin K-Max Unmanned Self-flying Helicopter; Boeing MH-6 Little Bird Helicopter; SIN-VAPOR I Smartphone System; Samsung Galaxy s6 Microscope Smartphone; VOCket System; Nett Warrior Smartphone System; Northrop Grumman X-47B UCAS I X-478 Control Display Unit; GammaPix; NFC Samsung Galaxy s6 Smartphone Sensor; Cell-All Synkera MikroKera Ultra; Biotouch System; iPhone Biodetector Smartphone; Navy Marine Corps Intranet; FLIR identiFINDER R300; AOptix Stratus MX Peripheral; MultiRae Pro Wireless Portable Multi Threat Radiation and Chemical Detector; PositiveID's M-BAND; PositiveID's Firefly DX; 1"x2" Detection Device Samsung Galaxy s6 Smartphone; 2"x2" Detection Device Samsung Galaxy s6 Smartphone; NetS2 SmartShield G300 Radiation Detector Samsung Galaxy s6 Smartphone; NetS2 SmartShield G500 Radiation Detector Samsung Galaxy s6 Smartphone; and the Passport Systems Base Control Unit; Oshkosh

4

Defense Autonomous Unmanned Ground Vehicle TerraMax; and the Variable NODE+Oxa. 2/72/76 Am. Compl. at, ¶¶ 68-127."

"The February 12, 2016 Amended Complaint's NFC claims also allege sufficient facts to plausibly establish that the use of the accused devices was "with the authorization or consent of the Government." Authorization or consent can be implied from the circumstances, "e.g., by contracting officer instructions, [or] specifications or drawings which impliedly sanction and necessitate infringement." *Hughes Aircraft Co.*, 534 F.2d at 901. For example, in *TVI Energy Corp.*, the [] Federal Circuit held that the Government impliedly sanctioned the use of a patented invention when it issued a solicitation that required bidders to submit for inspection, and perform live demonstrations of, the accused device. *See TVI Energy Corp.,806 F.2d at 1060.*"

"The relevant [awards] are being used to develop: "a portable smartphone attachment that can be used to perform sophisticated field testing to detect viruses and bacteria," 2/12/16 Am. Compl. ¶78; "[a device] that derives biological signals from your smartphone's accelerometer … [and] [t]his information is useful to base medical diagnoses in real-life conditions and to help track chronic health condition and effects of therapeutic interventions," 2/12/16 Am. Compl. ¶80; "a cradle and app for the iPhone to make a handheld biosensor that uses the phone's own camera and processing power to detect any kind of biological molecules or cells," 2/12116 Am. Compl. ¶92; a handheld instrument to help contain the spread of Ebola, HIV, Tuberculosis, and Malaia, 2/12/16 Am. Compl. ¶102; "[a portable device for] real-time detection of explosives, toxicants, and radiation," 2/12/16 Am. Compl. ¶122; "highly sensitive rapid medical diagnostic tests," 2/12/16 Am. Compl. ¶126."

"Viewed in the light most favorable to Plaintiff, the February 12, 2016 Amended complaint alleges sufficient facts to raise a plausible right of relief under section 1498(a). See *Iqbal*, 556 U.S. at 677. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." "For the reasons discussed herein, the Government's June 24, 2016 Motion to Dismiss Certain Devices, pursuant to RCFC 12(b)(1) and 12(b)(6), is denied."

It is alleged Google contributes to the infringement of Complainant's patented invention(s) with its Google Android Open-Source Operating System software that is *"embedded"* in the Google smartphones before importation.

For patent law, 35 U.S.C. Section 271 defines contributory infringement, as "one who sells or imports a component of a patented invention, knowing it is especially made or adapted for infringement and has no substantial non-infringing use."

Establishing contributory infringement requires Complainant proving two core elements. These are, an underlying direct infringement by a third party (see the previous section on induced infringement), and the alleged contributory infringer [Google], knowledge and material contribution to that infringement.

The first element is Google's material contribution to the infringement, meaning Google provided a product [its Google Android Open-Source Operating System software], service, or assistance that substantially facilitated the direct infringement. This involves active facilitation of the infringing conduct. Providing equipment or tools specifically designed for infringement, or actively encouraging infringing activities, can constitute material contribution.

The second element, knowledge of the infringing activity, means Google must have known or had reason to know of the infringement. This knowledge can be actual, where Google is directly aware of the infringement, or constructive, implying Google should have known based on the circumstances. Some courts consider "willful blindness," where Google deliberately avoids confirming suspected infringement, as satisfying the knowledge requirement.

In *A&M Records v Napster* 239 F.3d 1004 (9th Cir. 2001), the Ninth Circuit Court of Appeals found Napster liable for both "contributory infringement" and "vicarious infringement". Regarding the issue of contributory infringement, the court held that *Napster* had "actual knowledge" of infringing activity, and

providing its *software* and services to the infringers meant that it had "materially contributed" to the infringement. Likewise, so have Google.

### Google's Joint infringement

Google's acts necessary for joint infringement; including "acts of direct infringement, [does] not occur simultaneously at the time of importation … [i]n many cases, such acts cannot occur at the time of importation" See *Suprema, Inc. v. International Trade Commission.*

Complainant allege Google; the Department of Defense (DoD); its Defense Threat Reduction Agency (DTRA); and Draper Laboratories, Inc. jointly infringed Complainant's communicating, monitoring, detecting, and controlling (CMDC) device. Complainant's CMDC device is described as a "mobile, consumer, or cellular device that is integrated with, or interconnected to (i.e., "embedded") a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability".

Complainant alleges joint infringement occurs when the Google smartphone, that is *"embedded"* with the Google Android Open-Source Operating System software before importation, is combined with the DoD-DTRA Android Tactical Assault Kit (ATAK) that is built on the Google Android Operating System; for integrating or connecting Draper's CBRNE plug-in sensors.

This combination, process, modification, or arrangement enables the Google smartphone to function as a CBRNE sensing device; and as such, infringes Complainant's patented invention for a "mobile, consumer, or cellular device that is integrated with, or interconnected to a CBRNE detection capability. Google controls the entire process with its Android Open-Source Operating System.

*Twelve Federal Judges confirm Google's alleged joint infringement liability.*

| # of Judge(s) | Case Number | Case Title | Court | Filed – Closed |
|---|---|---|---|---|
| Appellate Judges (3) | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Appellate Judges (3) | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 – (Transfer) |
| District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Appellate Judges (3) | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined [joint] infringement arises when there's a combined Google smartphone; DoD-DTRA ATAK Software; and Draper's CBRN sensor plugins. The Federal Circuit in *Larry Golden v. Google LLC* Case No. 22-1267 "vacated and remanded" the lower court case *Larry Golden v. Google LLC* Case No. 21-0244 back to the lower [District] court because Golden had met all the pleading requirements, and was therefore ready for trial. The original case *Golden v. Google LLC*, SCDC No. 6:2021cv00244 was filed in the South Carolina District Court on 01/26/2021. The case was dismissed as being "frivolous". Golden appealed the case to the U.S. Court of Appeals for the Federal Circuit.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 disclosed in "Discussion" that the Circuit reviewed the case "under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), [a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court ***again*** concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" ... "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation that

discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

Although the Federal Circuit did not specifically say "'without a doubt', Google's smartphone products that include the ATAK software and CBRN plugin sensors are literally and/or under the doctrine of equivalents, infringing Golden's patents asserted in the case", the Federal Circuit imply to say under the "clear and convincing evidence" standard, Google's smartphone products that include the ATAK software and CBRN plugin sensors are more likely than not, directly infringing Golden's patents asserted in the case.

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Samsung* CAFC Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* NDC Case No. 23-0048 that [joint] infringement arises when there's a combined Samsung smartphone; DoD-DTRA ATAK Software; and Draper's CBRN sensor plugins. In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system,"

involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google LLC* Case No. 22-5246; determined [joint] infringement arises when there's a combined Google smartphone; DoD-DTRA ATAK Software; and

Draper's CBRN sensor plugins. In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the DoD-DTRA ATAK application, and Draper's CBRN sensor plugins to the Google smartphone.

The Northern District of California Court Judge Rita F. Lin in *Golden v. Google LLC* Case No. 22-5246; determined [joint] infringement arises when there's a combined Samsung smartphone; DoD-DTRA ATAK Software; and Draper's CBRN sensor plugins. In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined [joint] infringement occurs when Google's mobile, consumer, or cellular device is integrated with, or interconnected to, Draper's CBRNE detection capability. In *Golden v. Google LLC*., Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

> "We conclude that the district court did not err in finding that
> Mr. Golden's five infringement "theories all require that the accused

products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407. Mr. Golden's second theory of infringement requires the use of "***NFC tags***," which are external to Google products. App'x 307 ("NFC-enabled smartphones communicate with NFC tags."); see also App'x 408–415. Mr. Golden's third theory of infringement requires using "Google's camera lens[1] with [a] microfluidic lens" that "***uses [a] microscope*** to focus on a chemical sensor." App'x 420–422 (emphasis added); see also App'x 416 423. Mr. Golden's fourth theory of infringement requires ***external sensors*** that the complaint alleges must be added on to Google's device. App'x 308; see also App'x 424–431. Mr. Golden's fifth theory of infringement requires "Google Beacon," ***a separate device***. App'x 308; see also App'x 432 439."

---

[1] Google's camera technology can be used as a microscope, leveraging its advanced imaging capabilities. Google cameras, particularly in smartphones, often feature high-resolution sensors that can capture fine details, essential for microscopic imaging.

**Google's Direct infringement**

After 15 months of review, the Patent Trials and Appeals Board (PTAB) decided in the trial of *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015: the term "built in, embedded" is construed to mean; "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

*Google's Smartphone Allegedly Directly Infringes Complainant's CMDC Device*

Both, the Google "megapixel" camera and the Google camera app are pre-installed ("built in, embedded") into Google Pixel Smartphones prior to importation; "such that [they are] an integral part of the device".

Twelve Federal Judges determined infringement of Complainant's patented invention (CMDC device) occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, ("built in, embedded"), a CBRNE-H detection capability.

Google's camera technology can be used as a microscope, leveraging its advanced imaging capabilities. Google cameras, particularly in smartphones, often feature high-resolution sensors that can capture fine details, essential for microscopic imaging. The digital zoom capabilities allow users to magnify images, which can simulate the effects of a microscope. Google's software algorithms enhance image clarity and detail, improving the quality of close-up images.

Various apps can assist in capturing and analyzing microscopic images, utilizing the camera's capabilities effectively. This combination of hardware and software makes Google cameras versatile tools for basic microscopic applications.

"The camera captures the image from the array of nanopores that uses fluid rather than bulky moving parts. The sensors contained

in one array is determined by the resolution phone camera. The resolution in cell phone cameras; probe a million different spots on the sensor simultaneously." *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https://www.understanding nano.com/cell-phone-sensors-toxins.html

"Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras." *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-could-tell-you-what-an-object-is-made-of

All of Google's globally connected smartphone devices have sensors that are pre-installed before importation into the United States, of one kind or another (e.g. accelerometers, GPS, RF sensors, NFC sensors, *cameras* & microphones); therefore, it is theoretically possible to "instrument" virtually the entire population of the U.S. in one form or another, and to use this synoptic instrumentation to swiftly detect and respond to CBRN events.

Mobile apps can combine sensor feeds from many handsets to create vast "synthetic apertures" to detect earthquakes (from accelerometer data), explosions (from microphones) and even *gamma radiation* (from activation of cell *cameras*).

Sensor activity from *cameras*, microphones, accelerometers in mobile devices, laptops, computers and IOT devices (home security/automation, municipal, industrial) can detect, localize and

identify CBRN events, including those producing ***ionizing radiation***.

> *Retrieved from*: Homeland Security Science and Technology Advisory Committee, Quadrennial Homeland Security Review Subcommittee, Chemical, Biological, Radiological, and Nuclear Detection, chaired by Eric Haseltine with contributions from Dr. Gerald Parker, Dr. Yacov Haimes, Mr. Daniel Dubno as part of recommendations to the Department of Homeland Security, Under Secretary for Science and Technology, Robert Griffin

Google Pixel smartphones include a built-in [before importation into the United States] QR code scanner within the camera app, allowing users to easily scan QR codes without needing a separate application. Google Pixel, for example, offers a built-in ["embedded"] QR reader as part of its native camera app. This means that Pixel users can instantly scan QR codes without the need for any additional applications.

Google introduced the Scan QR code tile in Android 13. You can use it to scan a QR code quickly from your Google Pixel smartphone. QR codes, short for Quick Response codes, are two-dimensional barcodes that can be scanned using a smartphone's camera. The role of QR readers is to scan and decode these QR codes. With a simple scan using a QR reader, users can access websites, download apps, make payments, view product information, and much more.

Google's smartphone camera QR readers can read the QR codes printed on CBRNE (chemical, biological, radiological, nuclear, and explosives) equipment, detectors and/or sensors to enhance data sharing and operational efficiency; thus, allowing quick access to emergency protocols.

• One of the benefits of integration is real-time data access. QR codes can link to live data from CBRNE sensors, providing immediate access to critical information.

• Scanning a QR code can simplify the process of retrieving CBRNE sensor data, making it accessible to personnel without specialized training.

*Google's Smartwatch Allegedly Directly Infringes Complainant's Communicating / Monitoring Device; Multi-Sensor Detection Device; or, Cell Phone Detection Device*

After 15 months of review, the Patent Trials and Appeals Board (PTAB) decided in the trial of *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015: the term "communication device" is construed to mean the same as; "monitoring equipment".

Twelve Federal Judges determined infringement of Complainant's patented invention (CMDC device) occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to (PTAB construed terms for "built in, embedded"), a CBRNE-H detection capability.

Complainant has identified the Google Pixel Watch as at least "one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone), that is interconnected to a [Google Pixel Smartphone] for communication therebetween".

Claim 1 of the Complainant's '189 Patent: "A *communication device* of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:

a transmitter for transmitting signals and messages to at least one of plurality

17

product groups based on the categories of *a multi-sensor detection device*, [], *a cell phone detection device* …;

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of *a multi-sensor detection device*, [], *a cell phone detection device* …"

Claim 2 of the Complainant's '189 Patent: "*Monitoring equipment* of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising:

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of *a multi-sensor detection device*, [], *a cell phone detection device* …;

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of *a multi-sensor detection device*, [], *a cell phone detection device* …"

Claim 19 of the Complainant's '439 Patent: "A *multi-sensor detection system* for detecting at least one explosive, nuclear, contraband, *chemical, biological, human,* radiological agent, or compound, comprising: a plurality of sensors … capable of being disposed within, on, upon or adjacent a multi-sensor detection device.

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate to detect if a person is COVID-19 positive" https://www.biometricupdate.com/ 202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/ homeland-security -smartwatch-detect-nuclear-bombs/

Google's Pixel Watch is a smartwatch that houses a slew of health features powered by Fitbit. With that, the Pixel Watch has a lot of sensors packed into the 41mm frame, such as a heart rate, ECG, and even a blood oxygen sensor.

The Google Pixel Watch is an interesting product because it's a Wear OS device but natively integrates Fitbit health tracking. Fitbit is a separate company – owned by Google.

The optical heart rate sensor might be the most self-explanatory sensor on this Google Pixel Watch. Using powerful sensors, the optical lens captures minuscule movements in your skin to determine when your heart is pushing blood through your veins.

The Pixel Watch has the ability to collect ECG – electrocardiogram – readings. Those readings determine whether or not you seem to have an AFib – atrial fibrillation – heartbeat. In essence, that means your heart rate is irregular and could point to signs of other health issues.

To collect ECG data, the Pixel Watch uses an electrical sensor, which senses signals passing through the watch. This is why you need to touch your finger to the crown during an ECG reading. Electricity passes from your finger to your wrist through the Pixel Watch, giving the sensor a clear reading of what's going on.

The Google Pixel Watch is shipped into the United States with the following health sensors for chemical, biological, and human detection (CB-H).

- Red and infrared sensors for oxygen saturation (SpO2) monitoring
- Multipurpose electrical sensors compatible with ECG app
- Multi-path optical heart rate sensor

With heart rate monitors now standard in Google smartwatches, electrocardiograms (ECG/EKG) have rapidly become a common feature for the Google health wearable. ECG technology gained prominence through the Apple Watch Series 4 in 2018, but is commonplace within smartwatches in 2025. Devices from all major brands—Samsung, Google, Fitbit, Huawei, and Garmin—have watches with this feature.

Therefore, the Google Pixel Watch is a consumer device that is integrated with, or interconnected to, a CBRNE-H detection capability. Which means, the twelve federal judges were right in their judgement.

*Google's Tensor CPU/Chipset Allegedly Directly Infringes Complainant's Central Processing Unit (CPU) Device; Google's Android Operating System Allegedly Directly Infringes under the Doctrine of Equivalents Complainant's Transceiver*

Both the Google Tensor CPU and the Google Android Operating System are standard, pre-installed, and native to the manufacture of the Google Pixel phones before importation or shipment into the United States. Below is Complainant's patent specifications support for Complainant's patented "central processing unit" and "transceiver":

"The [added: Google Pixel Smartphone] includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site

20

monitoring computer terminals or PCs" ... "Each [added: Google Pixel Watch] includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the [added: Google Pixel Smartphone] so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the [added: Google Pixel Watch] cpu" ... "Each [added: Google Pixel Smartphone or Google Pixel Watch] can also be used as a manual, stand-alone [] scanner" ... "FIG. 19 is a perspective view of the multi sensor detection [] system of the present invention [added: Google Pixel Smartphone] illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment [added: Google Pixel Watch] to relay commands and signals to the cpu or transceiver" ... "The [added: Google Pixel Watch] includes an interior chamber divided into a number of compartments [] for holding therein agent or compound detection means hereinafter further described" ... "A cpu [] is mounted within the [added: Google Pixel Smartphone] and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment [added: Google Pixel Watch]" ... "Each [added: Google Pixel Watch] detector [] includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu [] of the [added: Google Pixel Smartphone]" ... "A representative example for [] utilizes the cell phone tower [] wherein the activation and/or distress signal [] originates from the cell phone [] or the laptop [] and such activation

signal [] travels to the cell phone tower [] that is nearest the current location" … "A signal [] is then transmitted to the monitoring site [] and specific monitoring equipment [added: Google Pixel Smartphone or Google Pixel Watch] that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PCs and LCD monitors" … "The monitoring site [] then communicates by signal to the GPS satellite that an original or activation signal has been received and then the GPS satellite [] locates and communicates [] with the CPU or transceiver" … "The monitoring equipment [added: Google Pixel Smartphone or Google Pixel Watch] then transmits a signal to the cell phone tower [] that communicates with the transceiver [202] and/or CPU" … "the vehicle's current location and then the signal has traveled to the monitoring equipment [added: Google Pixel Smartphone or Google Pixel Watch] and monitoring site [] which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The GPS satellite [] then locates and communicates with the CPU and/or transceiver…"

Complainant claims the Google smartphones' Tensor CPU allegedly infringes Complainant's patented new, improved upon, and useful central processing unit (CPU) for mobile devices. Google, in previous litigation, has failed to defend; the lower court has failed to compel Google to answer the allegations; and the Circuit failed to rule in favor of Complainant because Google has neither denied, defended, or challenged Complainant's alleged claims of infringement.

Complainant's CPU was invented specifically for Complainant's patented new, improved upon, and useful cell phone (CMDC device). Google's Tensor

CPUs; invented for mobile devices (i.e., Google Pixel smartphones) are recognized as the "brains" of the mobile, consumer, or cellular devices.

Both the Google Tensor CPUs and Complainant's patented CPUs, are responsible for carrying out the functional and operational instructions of the computer (smartphone) programs. Complainant has alleged the Google Pixel smartphone cannot operate or function without Complainant's patented CPUs.

The Google Tensor CPU and Google Android operating system (OS) are essential components of Google's mobile devices; each fulfilling unique functions that enhance user experience. Complainant claims Google is allegedly infringing his patented Central Processing Unit (CPU) [hardware], and Complainant claims his patented "transceiver" is equivalent to the Google Android Operating Systems (OS) [software]. The function of the CPU and OS is outlined below:

1. Google Tensor CPUs [hardware]
    - Function: The Google Tensor CPU hardware is the primary processor that executes instructions and manages tasks within the device.
    - Performance: Google Tensor CPUs are also designed for efficiency, balancing power consumption and processing speed to optimize battery life.
2. Google Android Operating Systems (OS) [software]
    - Function: The Google Android OS software manages hardware resources and provides a platform for applications to run.
    - User Interface: It offers the graphical interface that users interact with, enabling navigation and access to features.
3. Complementary Roles

- Integration: The Google Tensor CPU and the Google android OS work together to ensure smooth operation of applications and system functions.
- User Experience: A powerful Tensor CPU can enhance the performance of the Android OS, leading to faster app launches and smoother multitasking.

Understanding the distinct roles of mobile CPUs and operating systems helps in appreciating how they contribute to the overall functionality and performance of Google's Pixel smartphone devices.

In addition to Complaint's patented CPU being the "brains" of the mobile, consumer, and cellular devices; and the patented "transceiver" being the "mind" of the mobile, consumer, and cellular devices; there are several standard and pre-installed "antennas" on each of the Google Pixel smartphones that enables the integration with, or interconnection to, the Google Pixel smartphones for CBRNE-H detection. The Google smartphone antenna design include multiple antennas on each phone that are standard and pre-installed prior to importation or shipment:

1. Primary Cellular Antenna
2. Diversity Cellular Antenna
3. GPS Antenna
4. WIFI Antenna
5. Bluetooth Antenna
6. NFC Antenna

Twelve Federal Judges determined infringement of Complainant's patented invention (CMDC device) occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to (PTAB construed terms for "built in, embedded"), a CBRNE-H detection capability.

24

*Google Nest Products that Allegedly Directly Infringes Multiple Claim Limitations
of Complainant's Patent Claims*

The standard pre-installed Google Tensor CPU; Google Android Open-
Source Operating System; and Google Antennas for Connectivity; that are native
to the manufacture of the Google Pixel Smartphone before importation or shipment
into the United States; conditions the Google Pixel phone for infringing use when
the phone is integrated with, or interconnected to, certain Google Nest Products.

The operational and functional features of the Google Android Open-Source
Operating System include the following for connectivity:

- Android supports different types of connectivity for GSM, CDMA, Wi-Fi,
  Bluetooth, NFC, RFID, cellular, satellite, etc. for telephonic conversation or
  data transfer.
- Use Wi-Fi technology to pair with other devices while playing games or
  using other applications.
- Contains multiple APIs to support location-tracking services such as GPS.
- Manage all data storage-related activities by using the file manager.
- Contains a wide range of media supports like AVI, MKV, FLV, MPEG4,
  etc. to play or record a variety of audio/video.
- Supports different image formats like JPEG, PNG, GIF, BMP, MP3, etc.
- Supports multimedia hardware control to perform playback or recording
  using a camera and microphone.
- Android has an integrated open-source WebKit layout-based web browser to
  support User Interfaces like HTML5, and CSS3.
- Android supports multi-tasking means while running multiple applications at
  a time; and can switch between them.

**CONNECTIVITY OF MULTIPLE GOOGLE NEST PRODUCTS THAT ARE
IN COMMUNICATION WITH THE GOOGLE TENSOR CPU ALLEGEDLY
INFRINGES AT LEAST CLAIM 5 OF COMPLAINANT'S '287 PATENT**

| Google Pixel 6, 7, 8, 9, & 10 Smartphones | Patent #: 10,163,287; Independent Claim 5 |
|---|---|
|  | A monitoring device, comprising: |
| **Google Nest Thermostat – Device for Regulating Temperature**  | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| **Google Nest Security Cameras**  | at least one motion sensor in communication with the at least one CPU; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one global positioning system (GPS) connection in communication with the at least one CPU; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |

| | |
|---|---|
| **Google Nest × Yale Lock**<br> | at least one locking mechanism in communication with the at least one CPU … the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| **Google Nest Protect Smoke and CO Alarm (Chemical Detector)**<br> | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| **Google Nest Protect Smoke and CO Alarm (Chemical Detector)**<br> | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… |
| **Google Nest × Yale Lock**<br> | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, … or a building, send signals to lock or unlock doors, …such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

**Infringement of a Non-Practitioner's Patent Can Cause Irreparable Harm**

*AMICUS BRIEF*: STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA. Submitted by the United States Patent and Trademark Office (USPTO) and the United States Department of Justice (DOJ), In the United States District Court for the Eastern District of Texas—Marshall Division: *Radian Memory Systems LLC, Plaintiff, v. Samsung Electronics Co., LTD., and Samsung Electronics America, Inc., Defendants*. Case 2:24-cv-01073-JRG Document 52 Filed 06/24/25

The United States respectfully submits this statement under 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the U.S. Department of Justice to attend to the interests of the United States in any case pending in a federal court. The United States, through the Department of Justice Antitrust Division and the United States Patent and Trademark Office (USPTO), has a strong interest in protecting and promoting competition in the U.S. economy, including by promoting a strong and effective patent system. The USPTO—the Executive-branch agency charged with examining patent applications, issuing patents, and advising the President on intellectual property policy through the Department of Commerce— furthers these interests by promoting the proper and consistent interpretation of the Patent Act, which protects patent rights and rewards innovation. Broadly, the United States seeks to advance consistent and correct application and enforcement of the intellectual property laws, including the Patent Act, to safeguard patents, fuel economic growth, and spur innovation to advance American freedoms. Patent rights also work with the antitrust laws

to spur competition among innovators to create new and useful technologies, products, or services for consumers.

The incentive to innovate at the heart of the Patent Act is undermined when the availability of preliminary injunctions to block infringement is unduly limited. Congress has authorized injunctions "in accordance with the principles of equity to prevent the violation of any right secured by patent," 28 U.S.C. § 283, and "[i]njunctions are vital to [the patent] system" for "encouraging innovation," *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015). Without the possibility of injunctive relief, "the right to exclude granted by the patent would be diminished, and the express purpose of the Constitution and Congress, to promote the progress of the useful arts, would be seriously undermined." *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1577-78 (Fed. Cir. 1983) (abrogated on other grounds by *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006), as noted in *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1148-49 (Fed. Cir. 2011)).

Chief Justice Roberts joined the majority but also penned a concurrence, writing that since "at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases." Id. at 395 (Roberts, C.J. concurring). This "long tradition of equity practice is not surprising given the difficulty of protecting the right to exclude through monetary remedies that allow an infringer to use an invention against the patentee's wishes"—a difficulty that suggests irreparable harm.

In *eBay*, the Court specifically rejected wholesale categorical rules as inconsistent with equitable principles. 547 U.S. at 393. It

rejected the Federal Circuit's "general rule," unique to patent disputes, that an injunction will issue upon a finding of infringement and validity. *Id.* at 393-94. And, conversely, it rejected the district court's "broad classification" that a patentee who is willing to license could not establish irreparable harm. *Id.* at 393 … The Court noted that "some patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves." *Id.*

"The Federal Circuit has also held that "[e]ven without practicing the claimed invention, the patentee can suffer irreparable injury." *Presidio*, 702 F.3d at 1363. In Broadcom, 543 F.3d at 703, for example, the Federal Circuit held that the plaintiff "provided evidence of irreparable harm, despite the fact that it does not currently practice the claimed inventions" and had licensed the patents to another entity, and the court found irreparable injury and lack of an adequate legal remedy based on the difficulty of calculating monetary damages in a competitive "design-win" market. *Id.* The Federal Circuit acknowledged that the right of a patent holder to exclude likely would be diminished if payment were the preferred remedy because "a calculating infringer may [] decide to risk a delayed payment to obtain use of valuable property without prior negotiation or the owner's permission." *Presidio*, 702 F.3d at 1362-63."

"An injunction should not be punitive and is not designed to give a patent owner undue leverage. Rather, an injunction serves "to prevent the violation of any right secured by a patent." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 772 (Fed. Cir. 1993) (quoting 35 U.S.C. § 283). The leverage that it provides depends on the value of the patent: If there are equally good non-infringing alternatives to the

patented technology, then an appropriately scoped injunction will provide very little leverage. But if the invention is essential to the value of the product, the injunction will provide greater leverage in license negotiations. An appropriately scoped injunction leaves it to the parties, rather than courts, to determine the value of the technology."

**Proposed Settlement**

Complainant is proposing an early settlement of 10% of Google's cash reserves, not to exceed $10(B). Google's enormous cash reserves allow Google to invest in new projects, acquire other companies, and weather financial storms.

*Google Holds More Cash Than Microsoft, Apple and Meta Combined*

Across Big Tech, cash conveys power – enabling market leaders to snap up startups and steer the future of technology. How does Google's monetary muscle compare against rival tech titans?

- Google – $118 billion
- Microsoft – $111 billion
- Apple – $62 billion
- Meta – $53 billion

Google possesses well over double the cash reserves of any other tech peer. For perspective, Google could acquire American industrial giants like Boeing or Deere & Company outright with the over $100 billion in its coffers. Crunching the numbers further:

- Google alone holds 29% of the total $400 billion cash pile held by Microsoft, Apple, Meta and itself
- Alphabet's cash reserve constitutes nearly 6% of all cash held by S&P 500 companies

This staggering weight of money propels Google's market value over the $1.6 trillion mark – cementing its status as one of the world's most valuable firms. https://www.historytools.org/companies/how-much-cash-does-google-really-have

*Google's Financial Firepower Dwarfs Entire Industries*

To fully grasp the sheer scale of Google's cash stockpile, let's compare it to the annual revenues of entire industries:

- Larger than the global video game industry's $178 billion in 2021 revenues
- More than the $100 billion in annual revenues for the global bicycle industry
- Nearly triple the airline industry's 2021 total revenue of $42.2 billion

Google's cash reserves even exceed the annual R&D spending of every automotive company combined – which totaled $100 billion in 2021 according to Statista.

https://www.historytools.org/companies/how-much-cash-does-google-really-have

*Google's Liquid Assets Swell to Over $118 Billion*

Google's parent company Alphabet reported robust Q2 2023 earnings, including $74.6 billion in consolidated revenue. After subtracting operating costs, Google pocketed $19.5 billion in net income last quarter. Much of those profits flowed into Google's already-gargantuan cash reserves. As of June 30th 2023, Google possessed:

- $118.33 billion in cash, cash equivalents, and marketable securities
- This war chest has grown 12% from $105.7 billion in Q2 2022
- Highly liquid assets able to be deployed for acquisitions, R&D, and more

Bolstered by Google Cloud's first-ever quarterly profit, CFO Ruth Porat confirmed they will "continue investing aggressively" across Google's vast tech stack from search to quantum computing.

Flush with over $118 billion in dry powder, Google truly has unlimited budget to place bold bets in promising technologies before opponents can react. https://www.historytools.org/companies/how-much-cash-does-google-really-have

*Understanding Google's Massive Cash Reserves*

Google's massive cash reserves are a fascinating topic. The company has a staggering $121 billion in cash and cash equivalents, which is more than the GDP of many countries. This enormous cash hoard allows Google to invest in new projects, acquire other companies, and weather financial storms. Google's cash reserves are a result of its incredible profitability, with the company generating over $40 billion in operating income in 2020 alone.

Google's parent company Alphabet has a massive cash reserve of over $109 billion, which is more than $100 billion. This cash hoard is a significant amount that could be used to reward patient investors with more cash. Google has $100B in cash. Google's owner Alphabet ended last year with more than $109 billion in cash. That's a massive amount of money, and it's not being put to use. Alphabet didn't mention paying a dividend in its latest results.

Big Tech companies, including Google, have a significant amount of cash reserves. Slightly under $1.2trn is the estimated total cash and cash equivalents balance if they hadn't returned so much to investors in recent years.

This number is substantial and represents the amount of cash these companies have had to play with in recent years. Of course, some of these firms have been buying back stock in the years before, which could make the number even bigger.

Companies like Alphabet Inc. (GOOGL) and Apple Inc. (AAPL) have billions in cash reserves. Alphabet Inc. now holds $117 billion in cash, surpassing Apple Inc. which has $102 billion in liquid reserves, net of debt. Corporate

America held $2 trillion in cash as of March 2022, a 7% decrease from the record $2.15 trillion at the end of 2020.

Alphabet now holds $117 billion in cash; surpassing Apple's $102 billion in liquid reserves. This significant shift in cash reserves has sparked concerns about Alphabet's dominance in the market and its potential impact on shareholders and regulators.

https://www.cgaa.org/article/google-cash-reserves

*AI Summary—Google's Cash Reserves*

Google maintains substantial cash reserves, which have evolved significantly since the company's inception.

Cash Reserves Overview:

- As of 2023, Alphabet Inc. (Google's parent company) reports cash and cash equivalents exceeding $100 billion.
- The company has consistently increased its cash reserves over the years, reflecting strong revenue growth and profitability.

Historical Context:

- In 2004, Google went public with an initial cash reserve of approximately $1.67 billion.
- By 2010, cash reserves had grown to around $33 billion, driven by increasing ad revenues and diversification into other services.
- In 2020, reserves reached about $121 billion, bolstered by the surge in online services during the COVID-19 pandemic.

Strategic Use of Cash:

- Google uses its cash reserves for acquisitions, investments in technology, and research and development.

Market Position:

- Google's cash reserves provide a competitive advantage, allowing for flexibility in strategic initiatives and resilience during economic downturns.

Sources:

- Financial reports from Alphabet Inc.
- Market analysis from reputable financial news outlets.

Currently, Complainant has a pending case against Google in the Western District of Texas Court—Waco Division. *Golden v. Google LLC*, Case No. 25-0434. Complainant alleges Google in directly infringing; jointly infringing; infringing under the doctrine of equivalents; and, willfully infringing.

A settlement here, of 10% of Google's cash reserves, not to exceed $10(B), also settles the pending patent infringement litigation in the Western District of Texas Court—Waco Division. *Golden v. Google LLC*, Case No. 25-0434.

Therefore, the requested remedies do not pose any public health, safety, or welfare concerns, and Google have the opportunity to settle before Complainant's request for exclusion is ever granted; from Google's enormous cash reserves.

## The ITC must avoid a double standard for direct infringement "sells" under 35 U.S.C. § 271(a)

Section 271(a) states: "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

Unauthorized "sale" under 35 U.S.C. § 271(a) is defined as: "[s]elling a product that embodies the patented invention without the patent owner's consent."

*Avoiding a "double standard" on when infringement occurs under § 271(a)*

Qualcomm Inc. receives, according to the Federal Trade Commission, a running royalty on the price of each handset sold that contains Qualcomm's wireless modem chips, and a running royalty on the price of each handset sold that do not contain Qualcomm's wireless modem chips.

Which means that upon the sale of the Google Pixel smartphone that embodies Complainant's patented CPU invention; Complainant's patented detection device (i.e., Google's megapixel camera that is capable of Chem/Bio, Health, and CBRNE detection); and, Complainant's patented "transceiver" that is equivalent to Google's android open-source operating system, to the United States importers and distributors; Google has allegedly directly infringed Complainant's patented CMDC device under 35 U.S.C. § 271(a) at the point of sell. Anything less creates a "double standard" and/or a "loophole" in the statute.

The United States District Court Northern District of California; *Federal Trade Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its anticompetitive practices:

"Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a 5% running royalty on the price of each handset sold. These licenses are called Subscriber Unit License Agreements ("SULA") …"

"Specifically, Qualcomm charges a 5% running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio… LG Electronics (LGE) *paid Qualcomm a 5% running royalty on handsets containing Qualcomm modem chips and a 5.75% running royalty on handsets containing non-Qualcomm [] chips*… "

"Qualcomm and LG signed … Subscriber Unit License … Steve Altman (Qualcomm President) sent to Irwin Jacobs (Qualcomm Co-Founder and former

CEO): "They currently pay 5% when they use our chip and 5.75% when they don't. We have agreed to take their rate to 5% regardless of whose chip they use."

The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

> Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of 5% on the price of each phone sold...

> [O]n May 3, 2012, Sony and Qualcomm entered into a Subscriber Unit Patent License Agreement, effective February 16, 2012 through September 30, 2012 ("May 2012 Sony Interim License"). ECF No. 1326 at 9. Under the May 2012 Sony Interim License, Sony agreed to provisionally pay Qualcomm a 5% royalty on CDMA handsets."

> Under the [] SULA amendment, Samsung paid a 5% running royalty rate on CDMA handsets containing Qualcomm chips, subject to a $20 royalty cap."

> BenQ and Qualcomm signed a new patent license agreement. JX0030. Under the license agreement, BenQ owed Qualcomm's standard 5% running royalty rate, with the handset as royalty base. See JX0030-007 (defining the royalty base as "the Selling Price charged by LICENSEE for Subscriber Units Sold to such Purchaser."

Apple does not manufacture handsets itself but instead uses contract manufacturers, including Pegatron and Wistron, to manufacture handsets. ECF No. 1326 at 4. These contract manufacturers pay Qualcomm a 5% running royalty rate on the manufacturers' handset selling price.

Judge Koh determined, "Qualcomm's anticompetitive conduct is conduct that 'harms the competitive process and thereby harms consumers.'" 6ER1208 (quoting *Microsoft*, 253 F.3d at 58) ... "[A]pplying that standard, the district court agreed with the FTC that Qualcomm's practices were anticompetitive."

The Judge's decision severely chastised Qualcomm for basing its royalty on the price of the device (e.g., a handset). Significantly, the Judge framed this criticism based on principles of ***competition law and patent law***, not contract law. Judge Lucy Koh of the US District Court of the Northern District of California in her decision in *Federal Trade Commission v Qualcomm Incorporated* (5:17-cv-0220); determined that charging royalties based on the price of a handset was unreasonable and contrary to US law.

The Ninth Circuit overturns and allows Qualcomm to continue collecting royalties on the price of each handset (i.e., smartphone)

In the United States Court of Appeals for the Ninth Circuit, Federal Trade Commission, Plaintiff-Appellee, v. Qualcomm Incorporated, Defendant-Appellant. Case No. 19-16122. [Declaration of Under Secretary of Defense for Acquisition and Sustainment]; Ellen M. Lord writes, "Qualcomm is a global leader in the development and commercialization of foundational technologies and products used in mobile devices and other wireless products, including network equipment, broadband gateway equipment, and consumer electronic devices" ... "DoD firmly believes that any measure that inappropriately limits Qualcomm's technological leadership, ability to invest in research and development (R&D), and market

competitiveness, even in the short-term, could harm national security. The risks to national security include the disruption of DoD's supply chain and unsure U.S. leadership in 5G" …

Stopping the import, shipment, and sell of the Google Pixel smartphone devices that embodies Complainant's patented CPU invention; Complainant's patented detection device (i.e., Google's megapixel camera that is capable of Chem/Bio, Health, and CBRNE detection); and, Complainant's patented "transceiver" that is equivalent to Google's android open-source operating system; stops the alleged direct infringement under 35 U.S.C. § 271(a).

The requested remedies raise no public interest concerns, and the strong public interest in protecting intellectual property rights outweighs any hypothetical harm.

Dated: November 24, 2025

Respectfully submitted,

Larry Golden

Larry Golden

740 Woodruff Road #1102

Greenville, S.C. 29607

Tel.: (864) 992-7104