# Exhibit B

# UNITED STATES INTERNATIONAL TRADE COMMISSION

# WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN SMARTPHONE DEVICES AND COMPONENTS, THEREOF** | INVESTIGATION No. 337-TA-_____ |

**November 24, 2025**

# COMPLAINT UNDER SECTION 337 OF THE

# TARIFF ACT OF 1930, AS AMENDED

**Complainant**

Larry Golden, *Pro Se*

740 Woodruff Rd. #1102

Greenville, SC 29607

Tel. (864) 992-7104

**Proposed Respondent**

Google LLC

1600 Amphitheatre Parkway

Mountain View, CA 94043

Tel.: (650) 253-0000

## COMPLAINANT'S STATEMENT ON THE PUBLIC INTEREST

Pursuant to Commission Rule 210.8(b), Complainant Larry Golden ("Golden") submits this Statement on the Public Interest regarding the remedial orders it seeks against Proposed Respondent Google, LLC. ("Google"). Golden seeks a permanent limited exclusion order barring from entry into the United States: (1) certain Google Pixel smartphones, Google Pixel watches, Google Tensor CPUs, Google Megapixel cameras, and components that directly or indirectly infringe one or more claims of U.S. Patent No. 9,096,189 ("the '189 patent"), and/or claims of U.S. Patent No. 9,589,439 ("the '439 patent"), and/or claims of U.S. Patent No. 10,163,287 ("the '287 patent"), and/or claims of U.S. Patent No. 10,984,619 ("the '619 patent"), and/or claims of U.S. Patent No. 11,645,898 (the '898 patent). The asserted patents are collectively referred to herein as the "Asserted Patents".

Golden also seeks a permanent cease and desists order prohibiting Google, its subsidiaries, related companies, and agents from engaging in the importation, sale for importation, marketing and/or advertising, distribution, offering for sale, sale, use after importation, sale after importation, or other transfer within the United States of the Accused Products.

### I.   Introduction

As the Commission has recognized, protecting innovations and associated intellectual property rights is in the public interest. See, e.g., *Certain Baseband Processor Chips and Chipsets*, Inv. No. 337-TA-543, Comm'n Op. at 136-37 (June 19, 2007). The Commission has found that remedies such as those sought by Golden will not adversely affect "the public health and welfare, competitive conditions in the United States economy, the production of like or directly

competitive articles in the United States, [or] United States consumers." 19 U.S.C. § 1337(d)(1).

In 2020, Sonos filed a Section 337 investigation against Google, in which Sonos accused both audio players such as smart speakers, as well as mobile phones and laptops capable of controlling those speakers, of infringing certain U.S. patents. See *Certain Audio Players and Controllers, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-1191 (the "1191 investigation"), Notice of Institution of Investigation, 85 Fed. Reg. 7783 (Feb. 11, 2020) (defining the scope of the investigation to include "networked speaker devices, and devices (for example, mobile phones and laptops) capable of controlling these devices").

The Commission instituted the investigation without directing the ALJ to make a recommended determination on the public interest. See *id.* In the final Commission Opinion, it ultimately found that the public interest factors did not weigh against issuance of a remedy. See *Certain Audio Players and Controllers, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-1191, Comm'n Op., at 28-22 (Feb. 1, 2022).

## II. Use of the Accused Products in the United States

The Accused Products are specific types of smartphones and smartwatches that are used as personal handheld and wearable devices; in homes; in vehicles; and in businesses. In particular, they are consumer devices used in the United States for communicating, monitoring, detecting, and controlling.

## III. The Requested Remedies Do Not Pose Any Public Health, Safety, or Welfare Concerns

*AMICUS BRIEF*: STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA. Submitted by the United States Patent and Trademark Office (USPTO) and the United States Department of Justice (DOJ), In the United

3

States District Court for the Eastern District of Texas—Marshall Division: *Radian Memory Systems LLC, Plaintiff, v. Samsung Electronics Co., LTD., and Samsung Electronics America, Inc., Defendants*. Case 2:24-cv-01073-JRG Document 52 Filed 06/24/25

"The United States respectfully submits this statement under 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the U.S. Department of Justice to attend to the interests of the United States in any case pending in a federal court. The United States, through the Department of Justice Antitrust Division and the United States Patent and Trademark Office (USPTO), has a strong interest in protecting and promoting competition in the U.S. economy, including by promoting a strong and effective patent system. The USPTO—the Executive-branch agency charged with examining patent applications, issuing patents, and advising the President on intellectual property policy through the Department of Commerce— furthers these interests by promoting the proper and consistent interpretation of the Patent Act, which protects patent rights and rewards innovation. Broadly, the United States seeks to advance consistent and correct application and enforcement of the intellectual property laws, including the Patent Act, to safeguard patents, fuel economic growth, and spur innovation to advance American freedoms. Patent rights also work with the antitrust laws to spur competition among innovators to create new and useful technologies, products, or services for consumers.

The incentive to innovate at the heart of the Patent Act is undermined when the availability of preliminary injunctions to block infringement is unduly limited. Congress has authorized injunctions

4

"in accordance with the principles of equity to prevent the violation of any right secured by patent," 28 U.S.C. § 283, and "[i]njunctions are vital to [the patent] system" for "encouraging innovation," *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015). Without the possibility of injunctive relief, "the right to exclude granted by the patent would be diminished, and the express purpose of the Constitution and Congress, to promote the progress of the useful arts, would be seriously undermined." *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1577-78 (Fed. Cir. 1983) (abrogated on other grounds by *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006), as noted in *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1148-49 (Fed. Cir. 2011)).

Chief Justice Roberts joined the majority but also penned a concurrence, writing that since "at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases." Id. at 395 (Roberts, C.J. concurring). This "long tradition of equity practice is not surprising given the difficulty of protecting the right to exclude through monetary remedies that allow an infringer to use an invention against the patentee's wishes"—a difficulty that suggests irreparable harm."

Therefore, the requested remedies do not pose any public health, safety, or welfare concerns, and any alleged benefits offered by the Respondent's products will still be available to consumers if the Respondent's products are excluded. The Respondent's 70.8% Global market for Respondent's Android Operating System (OS) remains unaffected.

### IV. Like or Directly-Competitive Articles Could Replace the Accused Products

Again, the availability of like or directly-competitive articles raises no concerns. There are "countless other smartphone and smartwatch devices from competing manufacturers" that "incorporate "Like" components and are capable of communicating, monitoring, detecting, and controlling. The "countless other" smartphones and smartwatches are sold by major retailers and carriers and will be available to replace the products excluded by the requested remedies. Even Google can continue offering competitive articles not accused of infringement.

### V. Alternative Suppliers Have the Capacity to Replace the Accused Products

No public interest concerns exist when the market contains an adequate supply of competitive or substitute products for those subject to a remedial order. See, e.g., *Certain Elec. Digital Media Devices & Components Thereof*, Inv. No. 337-TA-796, Comm'n Op., at 114-15 (Sept. 6, 2013). Other companies sell far more smartphones and smartwatches than Google does and can replace the excluded products. And again, the Commission found no adverse public impact when Sonos accused Google's networked speaker devices and mobile phones and laptops capable of controlling the devices. See *Audio Players*, Comm'n Op., at 31-32. There is even less worry about alternative suppliers here, where the requested exclusion order will be directed only at smartphones and smartwatches and only at Google, which is not a leader in smartphone or smartwatch sales in the U.S.

### VI. The Requested Remedial Orders Will Not Harm U.S. Consumers

Because numerous suppliers produce smartphones and smartwatches like the accused Google products, "consumers [will] have available many choices in competitive products other than those produced by Google" if the requested

remedies issue. *Audio Players*, Comm'n, Op., at 31-32. and consumers may ultimately benefit from the protection of Golden's intellectual property rights, which promotes further innovation by others. See *Certain Digital Television Products and Certain Products Containing Same and Methods of Using Same,* Inv. No. 337-TA- 617, Comm'n Op., at 9 (Apr. 23, 2009) ("[P]rotection of intellectual property rights in the U.S. provides foreign and domestic businesses alike with a climate of predictability that fosters investment, innovation, and the exchange of technology and associated intellectual property rights."); *Certain Display Controllers and Products Containing Same*, Inv. No. 337-TA-491/481, Comm'n Op., at 66 (Feb. 4, 2005) ("[I]n the long run, protection of intellectual property rights [] will foster research and development of new technologies and will lead to greater competition in the marketplace.").

## VII. The ITC must avoid a double standard for direct infringement "sells" under 35 U.S.C. § 271(a)

Section 271(a) states: "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

Unauthorized "sale" under 35 U.S.C. § 271(a) is defined as: "[s]elling a product that embodies the patented invention without the patent owner's consent."

*Avoiding a "double standard" on when infringement occurs under § 271(a)*

Qualcomm Inc. receives, according to the Federal Trade Commission, a running royalty on the price of each handset sold that contains Qualcomm's

7

wireless modem chips, and a running royalty on the price of each handset sold that do not contain Qualcomm's wireless modem chips.

Which means that upon the sale of the Google Pixel smartphone that embodies Complainant's patented CPU invention; Complainant's patented detection device (i.e., Google's megapixel camera that is capable of Chem/Bio, Health, and CBRNE detection); and, Complainant's patented "transceiver" that is equivalent to Google's android open-source operating system, to the United States importers and distributors; Google has allegedly directly infringed Complainant's patented CMDC device under 35 U.S.C. § 271(a) at the point of sell. Anything less creates a "double standard" and/or a "loophole" in the statute.

The United States District Court Northern District of California; *Federal Trade Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its anticompetitive practices:

"Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a 5% running royalty on the price of each handset sold. These licenses are called Subscriber Unit License Agreements ("SULA") …"

"Specifically, Qualcomm charges a 5% running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio… LG Electronics (LGE) *paid Qualcomm a 5% running royalty on handsets containing Qualcomm modem chips and a 5.75% running royalty on handsets containing non-Qualcomm [] chips…* "

"Qualcomm and LG signed … Subscriber Unit License … Steve Altman (Qualcomm President) sent to Irwin Jacobs (Qualcomm Co-Founder and former CEO): "They currently pay 5% when they use our chip and 5.75% when they don't. We have agreed to take their rate to 5% regardless of whose chip they use."

The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

> Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of 5% on the price of each phone sold…

> [O]n May 3, 2012, Sony and Qualcomm entered into a Subscriber Unit Patent License Agreement, effective February 16, 2012 through September 30, 2012 ("May 2012 Sony Interim License"). ECF No. 1326 at 9. Under the May 2012 Sony Interim License, Sony agreed to provisionally pay Qualcomm a 5% royalty on CDMA handsets."

> Under the [] SULA amendment, Samsung paid a 5% running royalty rate on CDMA handsets containing Qualcomm chips, subject to a $20 royalty cap."

> BenQ and Qualcomm signed a new patent license agreement. JX0030. Under the license agreement, BenQ owed Qualcomm's standard 5% running royalty rate, with the handset as royalty base. See JX0030-007 (defining the royalty base as "the Selling Price charged by LICENSEE for Subscriber Units Sold to such Purchaser."

> Apple does not manufacture handsets itself but instead uses contract manufacturers, including Pegatron and Wistron, to

9

manufacture handsets. ECF No. 1326 at 4. These contract manufacturers pay Qualcomm a 5% running royalty rate on the manufacturers' handset selling price.

Judge Koh determined, "Qualcomm's anticompetitive conduct is conduct that 'harms the competitive process and thereby harms consumers.'" 6ER1208 (quoting *Microsoft*, 253 F.3d at 58) ... "[A]pplying that standard, the district court agreed with the FTC that Qualcomm's practices were anticompetitive."

The Judge's decision severely chastised Qualcomm for basing its royalty on the price of the device (e.g., a handset). Significantly, the Judge framed this criticism based on principles of ***competition law and patent law***, not contract law. Judge Lucy Koh of the US District Court of the Northern District of California in her decision in *Federal Trade Commission v Qualcomm Incorporated* (5:17-cv-0220); determined that charging royalties based on the price of a handset was unreasonable and contrary to US law.

The Ninth Circuit overturns and allows Qualcomm to continue collecting royalties on the price of each handset (i.e., smartphone)

In the United States Court of Appeals for the Ninth Circuit, Federal Trade Commission, Plaintiff-Appellee, v. Qualcomm Incorporated, Defendant-Appellant. Case No. 19-16122. [Declaration of Under Secretary of Defense for Acquisition and Sustainment]; Ellen M. Lord writes, "Qualcomm is a global leader in the development and commercialization of foundational technologies and products used in mobile devices and other wireless products, including network equipment, broadband gateway equipment, and consumer electronic devices" ... "DoD firmly believes that any measure that inappropriately limits Qualcomm's technological leadership, ability to invest in research and development (R&D), and market competitiveness, even in the short-term, could harm national security. The risks to

10

national security include the disruption of DoD's supply chain and unsure U.S. leadership in 5G" …

Stopping the import, shipment, and sell of the Google Pixel smartphone devices that embodies Complainant's patented CPU invention; Complainant's patented detection device (i.e., Google's megapixel camera that is capable of Chem/Bio, Health, and CBRNE detection); and, Complainant's patented "transceiver" that is equivalent to Google's android open-source operating system; stops the alleged direct infringement under 35 U.S.C. § 271(a).

## VIII. Conclusion

The requested remedies raise no public interest concerns, and the strong public interest in protecting intellectual property rights outweighs any hypothetical harm.

Dated: November 24, 2025

Respectfully submitted,

*Larry Golden*
Larry Golden
740 Woodruff Road #1102
Greenville, S.C. 29607
Tel.: (864) 992-7104