# Exhibit C

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## WASHINGTON, D.C.

---

**In the Matter of**

**CERTAIN SMARTPHONE DEVICES AND**

**COMPONENTS, THEREOF**

---

**INVESTIGATION No. 337-TA-_____**

November 30, 2025

## COMPLAINT UNDER SECTION 337 OF THE

## TARIFF ACT OF 1930, AS AMENDED

**Complainant**

Larry Golden, *Pro Se*
740 Woodruff Rd. #1102
Greenville, SC 29607
Tel. (864) 992-7104

**Proposed Respondent**

Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043
Tel.: (650) 253-0000

## I. INTRODUCTION

1.      Complainant Larry Golden ("Golden" or "Complainant") respectfully files this complaint under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, based on Proposed Respondents Google LLC ("Google"), Google's unlawful importation into the United States, sale for importation into the United States, and/or sale within the United States after importation of certain smartphone devices.

2.      This complaint is directed to Google's imported smartphone devices, smartwatches, and components thereof, including Google's central processing units [chipsets], megapixel cameras, and android open-source operating system that infringe; or, are manufactured by processes that infringe, one or more of claims 1, 7, & 8 of U.S. Patent No. 9,096,189 ("the '189 patent"); and/or claims 19, and 23 of U.S. Patent No. 9,589,439 ("the '439 patent"); and/or claims 4, 5, and 6 of U.S. Patent No.  10,163,287 ("the '287 patent"); and/or claims 1, and 11 of U.S. Patent No. 10,984,619 ("the '619 patent"), (collectively, the "Asserted Patents"), either literally or under the doctrine of equivalents. Such products include at least the Google Pixel Smartphone 6 Series; 7 Series; 8 Series, 9 Series, 10 Series, and Google Fold Series; Google Pixel Watch Series 2, 3, 4, & 5; Google's Megapixel Cameras; and Google's smartphone CPUs. The following table is a summary of the asserted patent and claims (independent claims in bold):

| Patent Number | Asserted Patents and Claims—*Exhibit A* Claim Chart Location |
|---|---|
| 9,096,189 | **Claim 1:** Smartphone (pg. 9 & pg. 114); NEST (pg. 52); Megapixel Camera (pg. 61); Android OS (pgs. 61-62, & pgs. 114-115)<br><br>**Claim 7:** Android OS (pg. 179)<br><br>**Claim 8:** Smartwatch (pg. 121) |
| 9,589,439 | **Claim 19:** Megapixel Camera (pg. 66, pg. 137, & pg. 163); Smartwatch (pg. 141); Android OS (pg. 179)<br><br>**Claim 23:** Smartphone (pg. 9, pg. 115 & pg. 165); NEST (pg. 52); Megapixel Camera (pg. 62 & pg. 165); Tensor CPU (pg. 165); Android OS (pgs. 62-63 & pgs. 116-117) |
| 10,163,287 | **Claim 4:** Tensor CPU (pg. 73, pg.121, & pg. 158); Android OS (pg. 77)<br><br>**Claim 5:** Smartphone (pg. 9, pg. 117, & pg. 154); NEST (pg. 52, pg. 130 & pg. 154); Megapixel Camera (pg. 64); Tensor CPU (pg. 78 & pg.121); Android OS (pg. 65, pg. 82, pg. 107, pg. 118, & pg. 132)<br><br>**Claim 6:** Tensor CPU (pg. 83 & pg.121); Android OS (pg. 87) |
| 10,984,619 | **Claim 1:** Tensor CPU (pg. 88 & pg. 122)<br><br>**Claim 11:** Tensor CPU (pg. 93, pg. 122 & pg. 133) |

## II. PARTIES

**Larry Golden, Pro Se Complainant**

3.    Complainant Larry Golden is a citizen of South Carolina and has a principal place of business at 740 Woodruff Road, #1102, Greenville, S.C. 29607.the year 2007. Golden owns multiple patents and patent claims for a "new,

3

improved upon, and useful cell phone (i.e., smartphone)". The U.S. Patents 9,096,189 ("the '189 patent") includes nine (9) independent patent claims for the smartphone (i.e., new, improved upon, and useful "cell phone"); 9,589,439 ("the '439 patent") includes eleven (11) independent patent claims for the smartphone (i.e., new, improved upon, and useful "cell phone"); 10,163,287 ("the '287 patent") includes six (6) independent patent claims for the smartphone (i.e., new, improved upon, and useful "cell phone"); 10,984,619 ("the '619 patent") includes two (2) independent patent claims and eighteen (18) dependent patent claims for the smartphone (i.e., new, improved upon, and useful "cell phone"); and, 11,645,898 (the '898 patent) includes two (2) independent patent claims for the smartphone (i.e., new, improved upon, and useful "cell phone"). That's a combined total of forty-six (48) independent and dependent patent claims for Complainant's patented smartphone (i.e., new, improved upon, and useful "cell phone").

**Google LLC, Respondent**

4.      On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing jointly, directly, and/or indirectly the tort of literal patent infringement or infringement under the "doctrine of equivalents" giving rise to this

complaint. Google may be served at its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

5.     Google LLC is one of the largest technology companies in the world and conducts product sales, and online search operations in the District of South Carolina. Google LLC directly, jointly, and/or indirectly distributes, markets, offers to sell, sells, and/or imports the infringing Google Pixel Series of smartphones, smartwatches, and Google Tensor CPU/chipsets into the U.S.

## III. THE TECHNOLOGIES AND PRODUCTS AT ISSUE

### Background of the Technologies

6.     In the year 2007, the Department of Homeland Security (DHS) published on 10/27/2007 the DHS S&T Broad Agency Announcement BAA07-10; *CELL-ALL Ubiquitous Biological and Chemical Sensing*. Stephen Dennis, Program Manager for the *Cell-All* project was quoted as saying, "[t]oday's biological and chemical sensing networks work effectively to cover limited and specific physical areas and environments with significant cost and overhead. In order to greatly expand coverage and realize greater WMD protection for the nation, a revolutionary breakthrough that provides for a much larger and lower cost sensing distributed network is required. For example, if biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially

5

benefit from a sensor network with more than 240M sensors [1] … '[t]hrough this

BAA, HSARPA is seeking to accelerate advances in miniaturized biological and

chemical sensing (e.g. laboratories on a chip) with integration into common

device(s) and a communication systems concept for large scale multi-sensor

networks [2].'"

    7.      The present invention is designed to provide a multi sensor detection

and/or disabling lock system that can be implemented by business or government

at a minimum cost by organizing the products to be protected into product

grouping categories;

    8.      The perspective view of the multi sensor detection and/or lock

disabling system of the present invention illustrating the incorporation of the

---

[1] Google Android Statistics: Android is everywhere right now, running on billions of smartphones and tablets worldwide. It is the most popular operating system, with about 4 billion active users in 190 countries. https://electroiq.com/stats/android-statistics/

[2] While [the Department of Justice] aren't going as far as to demand Google spin off Android, they are leaving the door open. The government asked the judge to impose behavioral limitations that would essentially blunt Android from favoring Google's own general search services. Regulators asserted U.S. District Judge Amit Mehta should make it clear that Google could still be required to divest its smartphone [android] operating system if the other proposed measures prove ineffective at restoring competition to the search market. Google Android is the world's most popular smartphone operating system, found on 71% of mobile phones, Statcounter says. [S]o many devices by Samsung and many other tech companies — aside from Apple — have it pre-installed. https://apnews.com/article/google-android-chrome-antitrust-f4b73387d152a1c14c9df65bf0149a69

features and elements of the detector case to a cell phone and cell phone case; further, the perspective view of the multi sensor detection and/or lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a Monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop or vehicle slow-down system.

9.     Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, portable communication devices, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), and satellite monitoring, remote control key fobs, two-way communication key fobs, and handhelds.

10.     A communication device that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for communication therebetween; the monitoring equipment comprising: at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send

7

signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

**Products at Issue**

11.    Google Pixel Smartphone 6 Series; 7 Series; 8 Series, 9 Series, 10 Series, and Google Fold Series; Google Pixel Watch Series 2, 3, 4, & 5; Google's Megapixel Cameras; and Google's smartphone Tensor CPU/chipsets.

12.    Most Android devices run the proprietary Android version developed by Google, which ships with additional proprietary closed-source software pre-installed. Android has historically been developed by a group of developers known as the Open Handset Alliance, but its most widely used version is primarily developed by Google.

13.    First released in 2008, Android is the world's most widely used operating system; it is the most used operating system for smartphones, and also most used for tablets; the latest version, released on June 10, 2025, is Android 16.

14.    Android devices incorporate many optional hardware components, including still or video cameras, GPS, orientation sensors, [] accelerometers, gyroscopes, barometers, magnetometers, proximity sensors, pressure sensors,

thermometers, and touchscreens. Some hardware components are not required, but became standard in certain classes of devices, such as smartphones, and additional requirements apply if they are present. In addition to running on smartphones and tablets, several vendors run Android natively on regular PC hardware with a keyboard and mouse. Android runs on a wide variety of devices such as smartphones, tablets, cars, computers, and smart watches.

15.     However, the vast majority of Android-powered devices are smartphones. Unlike its two main competitors in the mobile operating system space, namely iOS and HarmonyOS, Android devices are made by many different original equipment manufacturers. These OEMs include Samsung, Xiaomi, Vivo, Oppo, iQOO, OnePlus, Honor, Google, Sony, Lenovo, Sharp, Realme, Nothing, and Tecno.

16.     In 2005, Google made a seemingly small acquisition that raised eyebrows—$50 million for a 22-month-old startup. Today, that startup powers 3.9 billion users, earns more than Snapchat, Airbnb, and Uber combined, and dominates the mobile world.

17.     Complainant's communication, monitoring, detecting, and controlling, (CMDC) devices are products grouped by common features (i.e., android open-source operating system) and design similarities of at least that of a cell phone, smartphone, PDA, handheld, PC, tablet, laptop, or smartwatch. Which

9

means the Google android operating system that is native to the manufacture of the Google products, and pre-installed prior to shipment or importation, is the preferred operating system for each of Complainant's patented inventions listed below:

| Invention I:<br>U.S. Patent No: 7,385,497<br>"CBR Multi Sensor Detection System" |
|---|
| Invention II:<br>U.S. Patent No: 7,385,497<br>"CBR Multi Sensor Detection with Lock Disabling System" |
| Invention III:<br>U.S. Patent No: 7,385,497<br>"CBR Multi Sensor Detection with Automatic/Mechanical Lock Disabling System" |
| Invention IV:<br>U.S. Patent No: 7,385,497<br>"CBR Multi Sensor Detection; Lock Disabling; Stall, Stop, Vehicle Slow-Down System" |
| Invention V:<br>U.S. Patent No: 8,106,752<br>"Cellular and/or Satellite Stall-To-Stop Vehicle Slowdown System" |
| Invention VI:<br>U.S. Patent No: 8,106,752<br>"CBR Multi Sensor Detection with Corresponding Indicator Lights for Visual Confirmation" |
| Invention VII:<br>U.S. Patent No: 8,334,761<br>"Remote Controlled Stall-To-Stop Vehicle Slowdown System" |
| Invention VIII:<br>U.S. Patent No: 8,334,761<br>"Vehicle Slowdown Means is Pre-Programmed to Automatically Activate" |
| Invention IX:<br>U.S. Patent No: 8,531,280<br>"Product Grouping Detection, Stall-to-Stop, Lock Disabling Security Systems" |
| Invention X:<br>U.S. Patent No: RE43,891<br>"Vehicle Slowdown System Interconnected to the Electromotive System" |
| Invention XI:<br>U.S. Patent No: RE43,891<br>"Vehicle Slowdown System with GPS Location and Tracking" |

| |
|---|
| Invention XII:<br>U.S. Patent No: RE43,891<br>"Vehicle Slowdown System Interconnected to the Vehicles Computer Systems" |
| Invention XIII:<br>U.S. Patent No: RE43,891<br>"Pre-Programmed Vehicle Slowdown "Operating" System" |
| Invention XIV:<br>U.S. Patent No: RE43,891<br>"Anti-Terrorism Product Grouping Security Systems" |
| Invention XV:<br>U.S. Patent No: RE43,891<br>"Pre-Programmed Vehicle Stall-to-Stop with Brake Override System" |
| Invention XVI:<br>U.S. Patent No: RE43,891<br>"Vehicle Slow-Down Controlled by a Mobile, Portable, or Fixed Communication Device" |
| Invention XVII:<br>U.S. Patent No: RE43,891<br>"Vehicle Slow-Down System Comprises a Transceiver Carried by the Vehicle" |
| Invention XVIII:<br>U.S. Patent No: RE43,891<br>"Vehicle Stall-to-Stop System with Ignition Lock" |
| Invention XIX:<br>U.S. Patent No: RE43,990<br>"Internal/External Automatic/Mechanical Lock Disabler System" |
| Invention XX:<br>U.S. Patent No: RE43,990<br>"Maritime Cargo Container Multi-Sensor Detection System" |
| Invention XXI:<br>U.S. Patent No: RE43,990<br>"Internal/External Remote/Electrical Lock Disabler System" |
| Invention XXII:<br>U.S. Patent No: RE43,990<br>"Maritime Container Detection System for Seaport Crane, Harbor Crane, Straddle-Carrier" |
| Invention XXIII:<br>U.S. Patent No: RE43,990<br>"Product Grouping for Maritime Cargo Container Multi-Sensor Detection System" |
| Invention XXIV:<br>U.S. Patent No: 9,096,189<br>"CMDC Device with Bluetooth Connected Multi-Sensor Detection Devices" |
| Invention XXV:<br>U.S. Patent No: 9,096,189<br>"Monitoring Equipment with Radio Frequency (RF) Connected Detection Devices" |

| |
|---|
| Invention XXVI:<br>U.S. Patent No: 9,096,189<br>"Monitoring Equipment with WiFi/Internet Connected Detection Devices" |
| Invention XXVII:<br>U.S. Patent No: 9,096,189<br>"Built-in, Embedded Fixed Multi Sensor Detection System" |
| Invention XXVIII:<br>U.S. Patent No: 9,096,189<br>"Built-in Sensor Array for CBRNE-H Detection" |
| Invention XXIX:<br>U.S. Patent No: 9,096,189<br>"Monitoring Equipment with Built-in Sensor Array for CBRNE-H Detection" |
| Invention XXX:<br>U.S. Patent No: 9,096,189<br>"CBRNE-H Sensors Disposed In, On, Upon, or Adjacent a Multi Sensor Detection Device" |
| Invention XXXI:<br>U.S. Patent No: 9,096,189<br>"Lock Disabling Mechanism for Monitoring Equipment" |
| Invention XXXII:<br>U.S. Patent No: 9,096,189<br>"Monitoring Equipment with Near-Field Communication (NFC) for CBRNE-H Detection" |
| Invention XXXIII:<br>U.S. Patent No: 9,589,439<br>"Product Grouping Inventions, (Devices, Apparatuses, and Systems for Border Security)" |
| Invention XXXIV:<br>U.S. Patent No: 9,589,439<br>"CMDC Device with Biometric Fingerprint/Facial Lock Disabler" |
| Invention XXXV:<br>U.S. Patent No: 9,589,439<br>"Monitoring Equipment Capable of Wired or Wireless Communication" |
| Invention XXXVI:<br>U.S. Patent No: 9,589,439<br>"Monitoring Equipment Capable of Receiving Signals from Cargo Container CBR Devices" |
| Invention XXXVII:<br>U.S. Patent No: 9,589,439<br>"Built-in, Embedded Multi Sensor Detection System Capable of Human Sensing" |
| Invention XXXVIII:<br>U.S. Patent No: 9,589,439<br>"Built-in, Embedded Multi Sensor Detection System with Alarm System" |
| Invention XXXIX:<br>U.S. Patent No: 9,589,439<br>"Detection System for Detecting Motion, Perimeter, Temperature, Tampering, Theft" |

| |
|---|
| Invention XL:<br>U.S. Patent No: 9,589,439<br>"Multi-Sensor Detection System with Limited Types of Communication Means" |
| Invention XLI:<br>U.S. Patent No: 9,589,439<br>"Multi-Sensor Detection System Implemented by the Government" |
| Invention XLII:<br>U.S. Patent No: 9,589,439<br>"Multi-Sensor Detection Device and Monitoring Equipment "Tap" Exchange Data" |
| Invention XLIII:<br>U.S. Patent No: 9,589,439<br>"Communicating, Monitoring, Detecting, and Controlling (CMDC) Device" |
| Invention XLIV:<br>U.S. Patent No: 9,589,439<br>"New, Improved Upon, and Useful—Cell Phone" |
| Invention XLV:<br>U.S. Patent No: 10,163,287<br>"Front-End Processor for Communication between Monitoring Equipment and Lock" |
| Invention XLVI:<br>U.S. Patent No: 10,163,287<br>"Network Processor for Communication between Monitoring Equipment and Lock" |
| Invention XLVII:<br>U.S. Patent No: 10,163,287<br>"Network Processor for Communication between Monitoring Equipment and Vehicle" |
| Invention XLVIII:<br>U.S. Patent No: 10,163,287<br>"Communication Device comprising a Central Processing Unit (CPU)" |
| Invention XLIX:<br>U.S. Patent No: 10,163,287<br>"Monitoring Device comprising a Central Processing Unit (CPU)" |
| Invention L:<br>U.S. Patent No: 10,163,287<br>"Monitoring Equipment comprising a Central Processing Unit (CPU)" |
| Invention LI:<br>U.S. Patent No: 10,984,619<br>"CMDC Device—CPU for Processing Functional and Operational Instructions" |
| Invention LII:<br>U.S. Patent No: 10,984,619<br>"CPU of CMDC Devices, i.e. PC, Cellphone, Smartphone, Laptop, Handheld Scanner" |
| Invention LIII:<br>U.S. Patent No: 11,645,898<br>"CPU Processing Instructions for Pre-Programmed Stall, Stop, Vehicle Slow-Down System" |

| Invention LIV: |
| :--- |
| U.S. Patent No: 11,645,898 |
| "Stall, Stop, Vehicle Slow-Down System for Autonomous, Driverless, Self-Drive Vehicles" |

| Invention LV: |
| :--- |
| U.S. Patents: [7,385,497]; [8,106,752]; [8,334,761]; [8,531,280]; [RE43,891]; [RE43,990]; [9,096,189]; [9,589,439]; [10,163,287]; [10,984,619]; and, [11,645,898] |
| "The Patented Inventions of the Asserted Patents is Alleged to be 'Appropriated or Used' to Further the Military Defense; National Security; and Public Health and Safety Interest" |

18.    Referencing the same "infringement theory" applied by Google and affirmed by the Northern District of California Court and the United States Court of Appeals for the Federal Circuit in *Golden v. Google LLC*: "infringement occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE detection capability"; taken from the list of inventions described above, Complainant is relying on the same "infringement theory" applied by Google and affirmed by the Northern District of California Court and the United States Court of Appeals for the Federal Circuit in *Golden v. Google LLC*, that infringement also occurs when the Google devices are not only integrated with a detection capability, but also when the Google devices are integrated with controlling locks; controlling autonomous and driverless vehicles; and monitoring systems for vulnerable sites and places (borders, airports, federal buildings, ports).

# IV. THE ASSERTED PATENTS AND NON-TECHNICAL DESCRIPTIONS

**The '189 Patent**

14

19.    **Identification and Ownership of the '189 Patent:** U.S. Patent No. 9,096,189 was duly and lawfully issued to Larry Golden as the sole inventor by the United States Patent and Trademark Office on August 4, 2015.

20.    **Foreign Counterparts to the '189 Patent:** Complainant is unaware of any foreign patents or patent applications corresponding to the '189 patent that have been filed, abandoned, withdrawn, or rejected.

21.    **Non-Technical Description of the '189 Patent:** After the 9/11 attacks Complainant introduced to certain members of the Federal Government three "Economic Stimulus and Terrorism Prevention Packages" that included a "Product Grouping" strategy and the technology rational to implement the economic recovery. The product grouping strategies and technology rational is explained in detail in the '189 patent specifications.

**The '439 Patent**

22.    **Identification and Ownership of the '439 Patent:** U.S. Patent No. 9,589,439 was duly and lawfully issued to Larry Golden as the sole inventor by the United States Patent and Trademark Office on March 7, 2017.

23.    **Foreign Counterparts to the '439 Patent:** Complainant is unaware of any foreign patents or patent applications corresponding to the '439 patent that have been filed, abandoned, withdrawn, or rejected.

24. **Non-Technical Description of the '439 Patent:** Between the years 2003-2006 Complainant submitted to various members of the Congress and to various Government agencies details of how to implement the three economic stimulus packages. Complainant received responses back from the Office of the President of the United States, George Bush; the Office of the Vice-President of the United States, Dick Cheney; and three U.S. Senators from the State of South Carolina, Fritz Holland, Jim DeMint, and Lindsay Graham. All responses confirmed the economic stimulus packages; the product grouping strategies; and technology rational was sent to the Department of Homeland Security (DHS) for implementation. The technology rational for a communicating, monitoring, detecting, and controlling (CMDC) device [i.e. new, improved upon, and useful cell phone] was sent over to the DHS and the written description for the CMDC device is found in the '439 patent specifications.

**The '287 Patent**

25. **Identification and Ownership of the '287 Patent:** U.S. Patent No. 10,163,287 was duly and lawfully issued to Larry Golden as the sole inventor by the United States Patent and Trademark Office on December 25, 2018.

26. **Foreign Counterparts to the '287 Patent:** Complainant is unaware of any foreign patents or patent applications corresponding to the '287 patent that have been filed, abandoned, withdrawn, or rejected.

16

27.    **Non-Technical Description of the '287 Patent:** In 2007, the Department of Homeland Security (DHS) published on 10/27/2007 its first request for a new, improved upon, and useful cell phone, under the DHS S&T Broad Agency Announcement BAA07-10; *CELL-ALL Ubiquitous Biological and Chemical Sensing* solicitation. Stephen Dennis, Program Manager for the *Cell-All* project was quoted as saying, "[t]oday's biological and chemical sensing networks work effectively to cover limited and specific physical areas and environments with significant cost and overhead. In order to greatly expand coverage and realize greater WMD protection for the nation, a revolutionary breakthrough that provides for a much larger and lower cost sensing distributed network is required. For example, if biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors ... '[t]hrough this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing (e.g. laboratories on a chip) with integration into common device(s) and a communication systems concept for large scale multi-sensor networks.'" In 2008, the DHS awarded four cell phone manufacturers Qualcomm, Samsung, LG, and Apple contracts to develop, assemble, and commercialize the new, improve upon, and useful cell phone for detecting CBRNE agents and compounds.

17

**The '619 Patent**

28.    **Identification and Ownership of the '619 Patent:** U.S. Patent No. 10,984,619 was duly and lawfully issued to Larry Golden as the sole inventor by the United States Patent and Trademark Office on April 20, 2021.

29.    **Foreign Counterparts to the '619 Patent:** Complainant is unaware of any foreign patents or patent applications corresponding to the '619 patent that have been filed, abandoned, withdrawn, or rejected.

30.    **Non-Technical Description of the '619 Patent:** Nancy Pelosi is quoted as saying before Congress, "Steve Jobs and Apple did not invent the smartphone, the Government did", "Apple did a great job at assembling the device". A credit to Apple and Steve Jobs; nowhere on the record is Apple and/or Steve Jobs quoted as saying they are the inventors of the smartphone.

https://www.cnet.com/culture/steve-jobs-didnt-create-the-iphone-govt-did-says-nancy-pelosi/.

https://www.cbsnews.com/sanfrancisco/news/nancy-pelosi-apple-iphone-steve-jobs-federal-research/.

https://www.forbes.com/sites/timworstall/2016/06/12/memo-to-nancy-pelosi-no-sorry-apple-and-steve-jobs-really-did-create-the-iphone/?sh=27c26b63487a. https://www.digitaltrends.com/mobile/federal-research-invented-iphone/

Written description on how to assemble the new, improved upon, and useful cell phone (i.e., smartphone) can be found in the '619 patent specifications. The technology for securing the device for public use that includes at least biometric fingerprint identification and a disabling locking mechanism to lock the phone after multiple failed attempts to unlock the phone is found in the '287 patent specifications.

## V. GOOGLE'S INFRINGEMENT

31.    On information and belief, Complainant alleges that Google's Pixel 6, 6a; 6 pro, 7, 7a, 7 pro, 8, 8 pro, 8-Fold, 9, 9 pro, 9-Fold, 10, 10 pro, and 10-Fold smartphones, directly and/or jointly infringes at least claim 1 of Complainant's '189 patent; claim 23 of Complainant's '439 patent; and/or claim 5 of Complainant's '287 patent, for Complainant's patented communicating, monitoring, detecting, and controlling (CMDC) device invention.

32.    On information and belief, Complainant alleges that Google's Tensor CPU/Chipsets, directly and/or jointly infringes at least claim 23 of Complainant's '439 patent; claims 4, 5, & 6, of Complainant's '287 patent, and/or independent claims 1, & 11, and dependent claims 2-10 & 12-20 of Complainant's '619 patent for Complainant's patented central processing unit (CPU) device invention.

33.    On information and belief, Complainant alleges that Google's Megapixel camera, directly infringes Complainant's cell phone detection device,

and/or infringes Complainant's patented multi-sensor detection device under the doctrine of equivalents; at least claim 1 of Complainant's '189 patent; claims 19 & 23 of Complainant's '439 patent; and/or claim 5 of Complainant's '287 patent. Complainant alleges Google's megapixel camera performs substantially the same function; in substantially the same way; to achieve substantially the same results as Complainant's multi-sensor detection device invention.

34.    On information and belief, Complainant alleges that Google's Pixel Watch Series 2, 3, 4, & 5, directly infringes Complainant's CMDC device, and/or infringes Complainant's patented cell phone detection device or multi-sensor detection device under the doctrine of equivalents; at least claims 1 & 8 of Complainant's '189 patent; claims 19 & 23 of Complainant's '439 patent; and/or claim 5 of Complainant's '287 patent. Complainant alleges Google's Pixel Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as Complainant's cell phone detection device, or multi-sensor detection device inventions.

35.    On information and belief, Complainant alleges that Google's NEST—CO Detector for integration with Google Pixel smartphones, directly infringes Complainant's cell phone detection device, and/or infringes Complainant's patented multi-sensor detection device under the doctrine of equivalents; at least claim 1 of Complainant's '189 patent; claim 23 of

20

Complainant's '439 patent; and/or claim 5 of Complainant's '287 patent.

Complainant alleges Google's NEST—CO Detector for integration with Google

Pixel smartphones performs substantially the same function; in substantially the

same way; to achieve substantially the same results as Complainant's multi-sensor

detection device invention.

36.    On information and belief, Complainant alleges that Google's

Android Open-Source Operating System, directly infringes under the doctrine of

equivalents; at least claims 1 & 7 of Complainant's '189 patent; claims 19 & 23 of

Complainant's '439 patent; and/or claim 4, 5, & 6 of Complainant's '287 patent.

Complainant alleges Google's Android Open-Source Operating System performs

substantially the same function; in substantially the same way; to achieve

substantially the same results as Complainant's "Transceiver" inventions.

37.    On information and belief, Complainant alleges that Google has, and

is actively through advertisements, publications, and announcements, inducing the

infringement of Complainant's patented CMDC devices (i.e., smartphones,

smartwatches) with its Google's Android Open-Source Operating System platform.

Google publishes a source code for anyone to build upon. Android is everywhere

right now, running on billions of smartphones and tablets worldwide. It is the most

popular operating system, with about 4 billion active users in 190 countries.

https://electroiq.com/stats/android-statistics/ Google Android is the world's most

popular smartphone operating system, found on 71% of mobile phones,

*Statcounter* says. [S]o many devices by Samsung and many other tech companies

— aside from Apple — have it pre-installed. https://apnews.com/article/google-android-chrome-antitrust-f4b73387d152a1c14c9df65bf0149a69 Google actively

aides other OEMs like Samsung in infringing Complainant's patented inventions.

Samsung holds 30.8% of global Android shipments, making it the largest Google

android smartphone vendor and the strongest driver of overall Android device

volume.

Complainant claims Google's pre-suit knowledge dates back to at least when

Google made an appearance in 2021; in *Golden v. Google LLC* CAFC Case No.

22-1267.

38.    On information and belief, Complainant alleges that Google has, and

is contributing to the infringement of Complainant's patented CMDC devices (i.e.,

smartphones, smartwatches) with its Google's Android Open-Source Operating

System platform. According to the contracting officer instructions or specifications

or drawings which impliedly sanction and necessitate infringement" *Hughes*

*Aircraft Co.*, 534 F.2d at 901, that the Government [DoD-DTRA]; in its Broad

Agency Announcement on 05/07/2019; Defense Threat Reduction Agency BAA

Call CBI-01 HDTRA1-19-S-0005 Chemical / Biological Technologies; the DoD-

DTRA is requesting in the solicitation's specifications, "ATAK [] that is:

- Software that is tested and verified. Mobile applications for lightweight and transportable devices such as smartphones and tablets, that enable the Warfighter to operate under the threat of Chemical and Biological threats.

The Android Tactical Assault Kit (ATAK) is software that is built on the Google's Android Open-Source Operating System platform by the DoD-DTRA. Under the contract Draper Laboratories is responsible for the CBRNE plug-in sensors for certain android smartphones and smartwatches.

Complainant claims Google's pre-suit knowledge dates back to at least when Google made an appearance in 2021; in *Golden v. Google LLC* CAFC Case No. 22-1267.

| Patent Number | Asserted Patents and Claims—*Exhibit A* Claim Chart Location |
|---|---|
| 9,096,189 | **Claim 1:** Smartphone (pg. 9 & pg. 114); NEST—CO Detector (pg. 52); Megapixel Camera (pg. 61); Smartwatch (pg. 114); Android OS (pgs. 61-62, & pgs. 114-115)<br>**Claim 7:** Android OS (pg. 179)<br>**Claim 8:** Smartwatch (pg. 121) |
| 9,589,439 | **Claim 19:** Megapixel Camera (pg. 66, pg. 137, & pg. 163); Smartwatch (pg. 141); Android OS (pg. 179)<br>**Claim 23:** Smartphone (pg. 9, pg. 115 & pg. 165); NEST—CO Detector (pg. 52); Megapixel Camera (pg. 62 & pg. 165); Tensor CPU (pg. 165); Smartwatch (pgs. 115-117, & pg. 121); Android OS (pgs. 62-63 & pgs. 116-117) |

| | |
|---|---|
| 10,163,287 | **Claim 4:** Tensor CPU (pg. 73, pg.121, & pg. 158); Android OS (pg. 77)<br><br>**Claim 5:** Smartphone (pg. 9, pg. 117, & pg. 154); NEST—CO Detector (pg. 52, pg. 130 & pg. 154); Megapixel Camera (pg. 64); Tensor CPU (pg. 78 & pg.121); Smartwatch (pg. 121); Android OS (pg. 65, pg. 82, pg. 107, pg. 118, & pg. 132)<br><br>**Claim 6:** Tensor CPU (pg. 83 & pg.121); Android OS (pg. 87) |
| 10,984,619 | **Claim 1:** Tensor CPU (pg. 88 & pg. 122)<br><br>**Claim 11:** Tensor CPU (pg. 93, pg. 122 & pg. 133) |

39.     Through multiple pleadings Google and the Courts failed to consider analyzing or evaluating Complainant's patent claims as method/process claims which require an element-by-element comparison; or, device/apparatus claims for determining when the "whole" invention was actually put into use.

40.     Instead, the Courts allowed Google to add an "inventive step" to Complainant's patent claims. The inventive step of "modification" is not claimed in any of Complainant's patent claims asserted in any complaints against Google.

| Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|
| 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

41.     The Courts allowed Google to improperly reverse claim construction for the term "built-in, embedded" that was decided at the PTAB; which extends to devices that were not only internal the Google smartphone, but external the Google smartphone as well. In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Google and the Courts reversed without a claim construction hearing because Google was without a "term" or "phase" to construe that justifies adding the term "modification".

42.     The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process".

43.     The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

25

Three-Judge Panel: "DISCUSSION. 'Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … this court has explained that a plaintiff …  must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

"Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…"

## A. Google's Infringement of the '189 Patent:

44.    "Mr. Golden's complaint includes a detailed claim chart *(Exhibit A-pgs. 1-191)* mapping features of an accused product, the Google Pixel 5 [6, 6a; 6 pro, 7, 7a, 7 pro, 8, 8 pro, 8-Fold, 9, 9 pro, 9-Fold, and 10, 10 pro, 10-Fold] Smartphone(s), to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ...[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...." Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267

**B. Google's Infringement of the '439 Patent:**

45.    "Mr. Golden's complaint includes a detailed claim chart *(Exhibit A-pgs. 1-191)* mapping features of an accused product, the Google Pixel 5[6, 6a; 6 pro, 7, 7a, 7 pro, 8, 8 pro, 8-Fold, 9, 9 pro, 9-Fold, and 10, 10 pro, 10-Fold] Smartphone(s), to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ...[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden

27

has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...." Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267

### C. Google's Infringement of the '287 Patent:

46.    "Mr. Golden's complaint includes a detailed claim chart *(Exhibit A-pgs. 1-191)* mapping features of an accused product, the Google Pixel 5 [6, 6a; 6 pro, 7, 7a, 7 pro, 8, 8 pro, 8-Fold, 9, 9 pro, 9-Fold, and 10, 10 pro, 10-Fold] Smartphone(s), to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ...[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...." Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267

### D. Google's Infringement of the '619 Patent:

47.    "Mr. Golden's complaint includes a detailed claim chart *(Exhibit A-pgs. 1-191)* mapping features of an accused product, the Google Pixel 5 [6, 6a; 6 pro, 7, 7a, 7 pro, 8, 8 pro, 8-Fold, 9, 9 pro, 9-Fold, and 10, 10 pro, 10-Fold] Smartphone(s), to independent claims from U.S. Patent Nos. [10,984,619],

10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…" Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267

## VI. SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE

48.    When it comes to manufacturing the Google Pixel phone, Google takes a unique approach by sourcing components from various countries and manufacturing in multiple locations. Google has multiple manufacturing locations for their Pixel phones. The majority of the phones are made in Taiwan, with additional production taking place in India and China. Furthermore, some of the components used in the Pixel phones are sourced from other countries such as Japan and South Korea. The Taiwanese company Foxconn is responsible for the majority of the assembly of Google Pixel phones.

> https://hellosmartlife.com/where-is-google-pixel-manufactured/#:~:text=The%20majority%20of%20Google%20Pixel%20phones%20are%20manufactured,additional%20production%20taking%20place%20in%20India%20and%20China

49.    In China, Google collaborates with established manufacturers to produce its smartphones. Taiwan, known for its semiconductor industry, plays a crucial role in the production of components for Google phones. Vietnam has emerged as a prominent manufacturing location for Google phones. South Korea, recognized for its technological prowess, is another key location where Google leverages the expertise of local manufacturers to ensure the precision and innovation of its smartphones.

https://cellularnews.com/device-reviews-and-comparisons/smartphones/where-is-google-phone-made/

50.    Fully assembled and packaged Google Pixel phones that are imported into the United States includes the Google Tensor Chipsets/CPUs. When the Google Pixel phones are excluded, the Tensor chipsets/CPUs are excluded.

The new Google Pixel 7 and Pixel 7 Pro smartphones are listed at $699 and $899 respectively, but Best Buy has huge deals on both of them to help you save. When you pre-order either of these smartphones with Best Buy, you'll be able to score up to $400 with eligible trade-in and free Best Buy e-Gift Cards.

https://www.usatoday.com/story/money/reviewed/2022/10/06/google-pixel-smartphone-deal-pre-order-best-buy/8195089001/

51.    Get the latest updates on the Google Pixel 8 Pro, with insights on design, performance, features, and exclusive AT&T offers. Limited Time. Requires trade-in of eligible device and eligible unlimited plan (speed

30

restrictions apply). Price after up to $1040 in credits over 36 mos. Other terms

apply.

https://www.att.com/brand/google/

52.    There are some differences between buying the Pixel from Google

and buying it from Verizon. The hardware itself may be the same, but the

experience of buying the Pixel from Google and buying it from Verizon is not

identical. The basic pricing is the same either way you go: $650 outright for the

base Pixel model or $27/mo. if you want to go the financing route. If you buy the

phone from Verizon, however, you'll have the option to trade in your old phone

and get credit toward your new purchase. Verizon says it'll go as high as $300,

depending on the device and condition.

https://www.computerworld.com/article/3128785/google-pixel-phone-
verizon.html#:~:text=We%20can%20quibble%20all%20day%20over%20se
mantics%2C%20but,website%20and%20in%20its%20own%20stores.%20T
hat%27s%20it.

53.    After holding trial from September to November 2023, ([b]efore trial,

the court deferred plaintiffs' motion to sanction Google for failure to preserve

evidence for trial, and it proceeded to partially grant Google's motion for summary

judgment. *Id*. (citing *United States v. Google LLC*, 687 F. Supp. 3d 48, 78–84, 85–

87 (D.D.C. 2023)). The partial grant of summary judgment dismissed claims that

Google's targeting of SVPs and use of compatibility commitments violated section

2 of the Sherman Act. *Id*. (citing *Google*, 687 F. Supp. 3d at 78–83)), the court

ruled largely in the plaintiffs' favor. Judge Mehta stated that "Google is a monopolist, and it has acted as one to maintain its monopoly." The court analyzed whether Google's distribution contracts constituted exclusive agreements. Applying the exclusive dealing framework from *United States v. Microsoft Corp.*, the court held that Google's agreements with Apple, Mozilla, and Android distributors, among others, which "establish[ed] Google as the out-of-the-box default search engine," constituted exclusive dealing. [added: OEMs such as Google and Apple "use" the search engines on their alleged infringing smartphone devices]. Comment on: No. 20-cv-3010, 2024 WL 3647498 (D.D.C. Aug. 5, 2024)

https://harvardlawreview.org/print/vol-138/united-states-v-google-llc/

54.     In the wake of the Supreme Court's elimination of "*Chevron* deference" in the *Loper* decision, many commentators have suggested that the ITC's authority over unfair imports under Section 337 might be curtailed. *See Loper Bright Enterprises v. Raimondo*, 2024 U.S. LEXIS 2882 (June 28, 2024). Most prominently, some have worried (or hoped, depending on their point of view), that the Federal Circuit's decision in *Suprema*, which affirmed the ITC's authority to find a Section 337 violation based on post-importation infringing activity, could be overturned. *See Suprema v. ITC*, 796 F.2d 1338 (Fed. Cir. 2015) (*en banc*).

These concerns were not totally baseless, as the *en banc* decision in *Suprema* explicitly relied on *Chevron* in affirming the Commission's interpretation of its statutory authority. 796 F.3d. at 1340-41 ("the Commission's interpretation of Section 337 is entitled to *Chevron* deference [and] is reasonable because it is consistent with Section 337 and Congress' mandate to the Commission to safeguard United States commercial interests at the border"). Indeed, earlier this summer, in a petition for re-hearing at the Federal Circuit, Google, a respondent in an ITC investigation (Inv. No. 337-TA-1191) teed up a challenge at the Federal Circuit to *Suprema's* holding, in anticipation of the potential reversal of *Chevron* by the Supreme Court. *See Sonos v. ITC*, No. 22-1421, Dkt. No. 98 at 9 (arguing that "*Suprema* cannot survive" if *Chevron* is reversed). Google's case involved similar facts to those present in *Suprema*, and Google argued that Section 337 violations should be interpreted narrowly to only address articles that infringe at the time of importation, and not infringing acts after importation. *Id*. at 10-13.

However, as the authors of this article previously noted, the *Loper* decision explicitly stated that prior decisions that relied on *Chevron* remain subject to statutory stare decisis. *See Loper* 2024 U.S. LEXIS 2882 at *60-61. So, with Google's challenge, it remained uncertain whether the Federal Circuit would take

Google's invitation to reconsider *Suprema*, and if it did, whether it would reach a different result absent the Chevron framework of agency deference.

With this week's ruling by the Federal Circuit, the wait is now over, and *Suprema* remains good law. On September 10th, the Federal Circuit denied Google's petition for rehearing and rehearing *en banc*. Order on Petition for Rehearing *En Banc*, Fed. Cir. Case No. 22-1421 (Sept. 10, 2024). By Mintz | Oct 14, 2024

https://www.premierappellatelawyers.com/news-publication/federal-circuit-rejects-googles-bid-to-shrink-itc-jurisdiction-over-post-importation-acts-of-indirect-infringement/

## VII. HARMONIZED TARIFF SCHEDULE NUMBERS

55.    The Accused Products are classified under at least the following subheading of the Harmonized Tariff Schedule of the United States: 851712. These classifications are exemplary in nature and not intended to restrict the scope of any exclusion order or other remedy ordered by the Commission.

## VIII. THE DOMESTIC INDUSTRY RELATING TO THE ASSERTED PATENTS

56.    The statutory intent of the ITC's domestic industry requirement, concludes that Congress understood subsections sections 337(a)(3)(A) and (B) to require exploitation of the patent only through manufacturing whereas the newly

added subsection (C) requires exploitation through engineering, research and development, licensing, or proof of the technical prong.

57.    The Federal Circuit recently ruled that subsection (C) domestic industries require proof of the technical prong, i.e., that there exist products practicing the patent. *See InterDigital Commc'ns, LLC v. ITC*, 707 F.3d 1295, 1303-04 (Fed. Cir. 2013); *Microsoft Corp. v. ITC*, 731 F.3d 1354, 1361-62 (Fed. Cir. 2013). *See* also *Certain Computers and Computer Peripheral Devices, and Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-841, Comm'n Op., at 24-40 (Jan. 9, 2014).

58.    Complainant has satisfied the Federal Circuit's ruling in *InterDigital Commc'ns, LLC v. ITC* with proof of the technical prong that there exist Respondent "Google" products practicing Complainant's patents and patented inventions.

59.    Prior to this ruling, non-practicing entity complainants could rely merely on their licensing activities, without having to show that there were any products actually practicing the patent-in-suit. Accordingly, with respect to alleged subsection (C) domestic industries, complainants must have one or more domestic industry products that practice the patent-in-suit. However, it is not necessary that the domestic industry product be manufactured in the U.S.

60.     Under Section 337 of the Tariff Act of 1930 (19 U.S.C. § 1337), the Commission conducts investigations into allegations of certain unfair practices in import trade. Section 337 declares the infringement of certain statutory intellectual property rights and other forms of unfair competition in import trade to be unlawful practices.

61.     In addition to unfair practices based upon infringement of certain specified statutory intellectual property rights, Section 337 also declares unlawful unfair methods of competition and unfair acts in the importation and sale of products in the United States, the threat or effect of which is to destroy or substantially injure a domestic industry, prevent the establishment of such an industry, or restrain or monopolize trade and commerce in the United States. Thus, in these types of investigations, threatened or actual injury must be shown.

### A. Technical Prong *(Exhibit A-pgs. 1-191)*

62.     The Commission has ruled that because the language of the technical prong refers to articles protected by "the patent" and not to only claims found to infringe, the requirement is satisfied if the Complainant's article, which is a new, improved upon, and useful cell phone / smartphone, practices any claim of the patent. *Certain Microsphere Adhesives, Process for Making Same, and Products Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm. Op. at 16 (Dec. 8, 1995).

63.     Complainant's U.S. Patent 9,096,189 ("the '189 patent") includes nine (9) independent patent claims for the smartphone (i.e., new, improved upon, and useful "cell phone"); U.S. Patent 9,589,439 ("the '439 patent") includes eleven (11) independent patent claims for the smartphone (i.e., new, improved upon, and useful "cell phone"); U.S. Patent 10,163,287 ("the '287 patent") includes six (6) independent patent claims for the smartphone (i.e., new, improved upon, and useful "cell phone"); and U.S. Patent 10,984,619 ("the '619 patent") includes two (2) independent patent claims and eighteen (18) dependent patent claims for the smartphone (i.e., new, improved upon, and useful "cell phone"); and, That's a combined total of forty-six (46) independent and dependent patent claims for Complainant's patented smartphone (i.e., new, improved upon, and useful "cell phone"). Therefore, the technical prong requirement is satisfied because the Complainant's article, which is a new, improved upon, and useful cell phone / smartphone, practices at least one, or any one of, the forty-six claims of the asserted patents.

64.     In other words, the patent claim used to satisfy the technical prong does not have to be the same as the patent claim the Complainant alleges is infringed by the Respondent. *Certain Soft-Edged Trampolines and Components Thereof*, Inv. No. 337-TA-908, Comm'n Op. at 54 (May 1, 2015).

65.     Demonstrating satisfaction of the technical prong means that Complainant will need to create a chart showing the presence of every element of a claim in the asserted patent exists in the Respondent, Google product(s). *Certain Computers and Computer Peripheral Devices, and Components Thereof, and Prods. Containing the Same*, Inv. No. 337-TA-841, Comm'n Op. at 40 (Jan. 9, 2014).

66.     Again, the Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 —Document 15 stated: "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ...[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims [claim 5 of the '287 patent; claim 23 of the '439 patent; claim 1 of the '189 patent] mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...."

67.     Under the "All Elements Rule", "[t]o prevail on a patent infringement claim, a patent owner must show by a preponderance of the evidence that each asserted patent claim limitation is found in the accused product or process, either:

38

literally or under the doctrine of equivalents. Literal infringement means that each claim limitation is literally found in the accused product or process. Under the doctrine of equivalents, a patent holder can prove infringement, even if one or more asserted patent claim limitations are not literally present in the accused product or process. For any limitation that is not literally present, the patent holder must show that the differences from the literal claim requirement are insubstantial.

68.     Consequently, the technical prong requirement was satisfied when the Federal Circuit defined the Google smartphone as literally infringing and/or infringing under the doctrine of equivalents at least the three claims [claim 5 of the '287 patent; claim 23 of the '439 patent; claim 1 of the '189 patent] mapped out in the claim chart.

69.     *(Exhibit A-pgs. 1-191)* include a duplicate of the claim chart submitted in *Larry Golden v. Google LLC*; CAFC Case No. 22-1267 that shows Google's smartphone as literally infringing and/or infringing under the doctrine of equivalents at least the three claims [claim 5 of the '287 patent; claim 23 of the '439 patent; claim 1 of the '189 patent] mapped out in the claim chart.

70.     *(Exhibit A-pgs. 1-191)* claim charts illustrate how the Respondent's Pixel 6, 6a, 6 pro, 7, 7a, 7 pro, 8, 8 pro, 9, 9 pro, 10, 10 pro, and Fold smartphones features are practically the same as the Respondent's Pixel 5 smartphone features. There are no substantial differences between the Google Pixel smartphones that

Google can rely on that deviates away from the distinguishing features of the Google Pixel 5 smartphone. Therefore, if the Circuit found the features of the Google Pixel 5 infringes Golden's patent claims, there's a strong likelihood that the Circuit will find that the features of the Google Pixel 6, 6a, 6 pro, 7, 7a, 7 pro, 8, 8 pro, 9, 9 pro, 10, 10 pro, and Fold smartphones, also infringes.

### B. Economic Prong *(Exhibit A-pgs. 192-295)*

*Subsection C: Google's infringement has substantially injured the domestic market for the smartphone and significant components of the smartphone patented by the Complainant:*

(a).    Communication, Monitoring, Detecting, and Controlling (CMDC) device (i.e., the new, improved upon, and useful cell phone (i.e., Google Pixel 6, 7, 8, 9, 10, & Fold smartphone series) Claim 11, of Patent No. 10,984,619 [the '619 patent]

(b).    Central Processing Unit (CPU) in communication with the new, improved upon, and useful cell phone (i.e., Google Pixel 6, 7, 8, 9, 10, & Fold smartphone series) Claim 11, of Patent No. 10,984,619 [the '619 patent]

(c).    Multi-Sensor Detection Device monitored by the new, improved upon, and useful cell phone (i.e., Google Pixel 6, 7, 8, 9, 10, & Fold smartphone series) Claim 19, of Patent No. 9,589,439 [the '439 patent]

(d).    Lock Disabling System controlled by the new, improved upon, and useful cell phone (i.e., Google Pixel 6, 7, 8, 9, 10, & Fold smartphone series) Claim 3, of Patent No. 10,163,287 [the '287 patent]

(f).    RF Transceiver for the new, improved upon, and useful cell phone (i.e., Google Pixel 6, 7, 8, 9, 10, & Fold smartphone series) Claim 4, of Patent No. 10,163,287 [the '287 patent]

(g).    Human Sensing and Home Security in communication with the new, improved upon, and useful cell phone (i.e., Google Pixel 6, 7, 8, 9, 10, & Fold smartphone series) Claim 1, of Patent No. 10,984,619 [the '619 patent]

(h).    Fingerprint and Facial Recognition in communication with the new, improved upon, and useful cell phone (i.e., Google Pixel 6, 7, 8, 9, 10, & Fold smartphone series) Claim 4, of Patent No. 10,984,619 [the '619 patent]

(i).    Bluetooth, Wi-Fi, Satellite, Cellular, GPS in communication with the new, improved upon, and useful cell phone (i.e., Google Pixel 6, 7, 8, 9, 10, & Fold smartphone series) Claim 8, of Patent No. 10,984,619 [the '619 patent]

*Subsection C: The Commission has deemed domestic pre-manufacturing investments in R&D satisfied this subsection where the protected article was manufactured abroad. See, e.g., Certain Integrated Circuits, Processes for Making Same, and Prods. Containing Same, Inv. No. 337-TA-450, USITC Pub. No. 3624, ID at 151-52 (May 6, 2002) (citing Certain Microcomputer Memory Controllers, Components Thereof and Products Containing:*

71.    Complainant responded with a R&D proposal to the DHS S&T BAA07-10; *CELL-ALL Ubiquitous Biological and Chemical Sensing,* call for the development of the *first* Smartphone as we know and understand it today.

72.    The Respondent Google continues to manufacture abroad certain smartphones asserted; modeled and designed after the R&D of Complainant that

includes at least nine (9) biosensors and various other means of detecting for
CBRNE agents and/or compounds that are "native" to the manufacture of Google's
smartphones: Included are: Ambient light sensor: Cancer biomarkers; Toxic
metals; Pathogens Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers Microfluidic cassette:
Interchangeable cassettes with varying assays VIS-NIR spectrometer: Food
freshness; Melanoma NNAP Electrodes: Toxic metals and Organic pollutants in
water. Optical Waveguide: Pathogens in water and food Back and front camera:
Colorimetric analysis; Image analysis Microphone: Voice recording stress levels.

73.    The Respondent Google continues to manufacture abroad certain
smartphones asserted; modeled and designed after the R&D of Complainant that
include the development of the first smartphone. In an effort to address similar
sensor needs to the *Cell-All* BAA, the Ohio Third Frontier Wright Center for
Innovations - the Institute for the Development and Commercialization of Advance
Sensor Technology (IDCAST) - was created.  IDCAST's mission is to establish
collaboration between academics, government and industry to develop new sensor
technology (remote and CBRNE). The IDCAST collaborators' vision for CBRNE
sensors is to use an interdisciplinary, team approach to fill an experimental
synthesis and process toolbox that contains various sensor platforms, materials,
and material synthetic/positioning processes that can be used to produce new,

globally competitive CBRNE sensors. Seven Ohio universities – Central State, Miami, Ohio State (OSU), Cincinnati, Dayton (UD), Toledo, Wright State and the Air Force graduate school – over 50 companies, and 6 government laboratories including the Air Force Research Laboratory (AFRL) at Wright Patterson AFB are IDCAST members. In just three years, IDCAST has produced new technologies that have created nearly 300 jobs.

*Subsection C: Google has individually monopolized and jointly conspired to form an oligopoly with the original smartphone manufacturers awarded by the DHS to develop, assemble, and commercialize the smartphone; [Apple, Samsung, LG, and Qualcomm] to prevent the establishment of a domestic market for the Complainant and restrain trade and commerce in the United States:*

74.    Complainant spent four years educating the Government on how to implement the three Economus Stimulus Packages with the new technology conceived and presented by the Complainant for mitigating terrorist activities and terrorism.

75.    Following are some examples of how Google has individually monopolized and jointly conspired to form an oligopoly with the original smartphone manufacturers awarded by the DHS to develop, assemble, and commercialize the smartphone; [Apple, Samsung, LG,  Qualcomm, and Google for it android operating system] to prevent the establishment of a domestic market for the Complainant and restrain trade and commerce in the United States for Complainant's patented CMDC devices (i.e., smartphones, laptops, tablets, and

PCs); multi-sensor detection devices; disabling locking devices; and stall, stop, vehicle slow-down systems.

a) NRL: SIN-VAPOR / Android Smartphone System: Developed by the U.S. Naval Research Laboratory (NRL) in Washington, D.C., the silicon nanowires in a vertical array with a porous electrode (SiN-VAPOR) sensor: In addition to detecting chemical weapons or explosives, the sensor can be used for identifying biological agents Dr. Christopher Field, the lead NRL scientist on the SiN-VAPOR research team is working with the NRL's biological research group to apply the sensor in this area.

b) Samsung Galaxy s6 "BioPhone": A Samsung Galaxy s6 "BioPhone" smartphone can measure your heart and breathing rates, even if you're not directly touching it. Researchers at MIT are working on a project called BioPhone that derives biological signals from your smartphone's accelerometer. Research is based upon work supported by the National Science Foundation (NSF CCF-1029585), Samsung, and the MIT Media Lab Consortium.

c) Samsung Galaxy s6 'Microscope" Smartphone: The U.S. Army Edgewood Chemical Biological Center (ECBC) is developing cellphone-based wide-field fluorescent imaging of microbeads for pathogen detection. Scientists at ECBC worked with a team at the University of California, Los Angeles (UCLA), to adapt its prototype of a plastic, clip-on "microscope" to fit a Samsung Galaxy Android phone, commonly used by the Army.

d) "VOCket System" / "Nett Warrior" Android Smartphone System: The Army's Edgewood Chemical Biological Center (ECBC) researchers are refining for Army use a commercial technology that will allow soldiers to accurately and rapidly detect an array of chemical and biological hazards - from mustard agent to anthrax.

e) GammaPix for Android Smartphones: GammaPix for Android Smartphones (e.g. Samsung Galaxy s6) scans for radiation using a smartphone camera sensor. Scanning for radiation and radioactive explosives the camera looks for a particular 'signature' left behind by gamma rays. It was created by Connecticut-based developers Image Insight under a $679,000 contract with the U.S. Defense Advanced Research Projects Agency (DARPA).

f) MIT: "NFC" Samsung Galaxy s6 Smartphone Sensor: The MIT "NFC" Smartphone sensors are made from modified near-field communication (NFC) tags. These tags, which receive the little power they need from the Samsung Galaxy s6 smartphone reading them, function as wirelessly addressable barcodes. MIT's research was funded by the U.S. Army Research Laboratory and the U.S. Army Research Office.

g) "Cell-All": Synkera MikroKera Ultra: Synkera presented the MikroKera Ultra Module at the Department of Homeland Security S&T "Cell-All" demonstration in Los Angeles on September 28, 2011. Synkera offers a general-purpose digital module for evaluation and use of MikroKera Ultra chemical sensors. Synkera Technologies has been funded by DHS to develop sensors that are suitable for integration into

cell phones and other ubiquitous electronic devices carried by first responders and the public at large.

h) "Cell-All": Android Phones: The "Cell-All" initiative. The Department of Homeland Security's (DHS) Science and Technology Directorate (S&T), Cell-All aims "to equip your cell phone with a sensor capable of detecting deadly chemicals", says Stephen Dennis, Cell-All's program manager. S&T pursued cooperative agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. Jing Li, a physical scientist at NASA's Ames Research Center, developed new technology that would bring compact, low-cost, low-power, high-speed nanosensor-based chemical sensing chip which consists of 64 nanosensors and plugs into an Apple iTouch 30-pin dock connector.

i) "Biotouch" Samsung Galaxy s6: Partnership between scientists and engineers at U.S. Army Edgewood Chemical Biological Center (ECBC), iSense, LLC., U.S. Army Communications-Electronics Research, Development and Engineering Center (CERDEC) and the Defense Threat Reduction Agency (DTRA). ECBC, iSense, CERDEC and DTRA are working together to give warfighters a quick, new way to evaluate potential chemical/biological (CB) threats using smartphones.

j) "Biotouch System" / "Nett Warrior" Smartphone System: The U.S. Army' developed a biological and chemical detection system. They developed volatile organic compound (VOC) strips that work with a device called a Biotouch. Biotouch relays information from VOC strips and sends results to a Nett Warrior Samsung smartphone, Defense

Systems reports. Partnership between scientists and engineers at U.S. Army Edgewood Chemical Biological Center (ECBC), iSense, LLC., U.S. Army Communications-Electronics Research, Development and Engineering Center (CERDEC) and the Defense Threat Reduction Agency (DTRA).

k) FLIR: identiFINDER R300 / Smartphone System: FLIR Systems, Inc. announced on June 16, 2011 that the Defense Threat Reduction Agency (DTRA) has awarded it a $1.1 million contract for a multi-year, multi-phase research and development contract to develop a mobile, ruggedized stand-off radiation detection system with identification capabilities. "FLIR has developed a radiation detection and identification device and is manufacturing the world's leading handheld radio-isotope identifier. The device qualifies as a detector case with features of multiple sensors, internet and GPS connection.

76.    The strategy for stimulating the Economy [as seen above] was for different branches of Government to rush the solicitations to the public; the competing companies submit proposals for the least amount of funding to fulfill the requirements of the solicitations, thereby developing a product and offering the product at minimum cost. The Government funding for the mass amount of technology requested will stimulate the economy with an increase in jobs and taxable revenue.

77.    Complainant is responsible for creating this industry. Complainant spent years (2003-2007) and countless bring the Government up to speed on how

the Economy can be stimulated with the three Economic stimulus packages that included certain innovative technology for implementation.

78.     The Government awarded certain billion-dollar corporations, Google included, to develop, manufacture, and commercialize the innovative technology included in each of the economic stimulus packages.

79.     Complainant started an industry complainant was restrained from participating in.

**Infringement of a Non-Practitioner's Patent Can Cause Irreparable Harm**

80.     *AMICUS BRIEF*: STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA. Submitted by the United States Patent and Trademark Office (USPTO) and the United States Department of Justice (DOJ), In the United States District Court for the Eastern District of Texas—Marshall Division: *Radian Memory Systems LLC, Plaintiff, v. Samsung Electronics Co., LTD., and Samsung Electronics America, Inc., Defendants*. Case 2:24-cv-01073-JRG Document 52 Filed 06/24/25 [*Exhibit B*]

The United States respectfully submits this statement under 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the U.S. Department of Justice to attend to the interests of the United States in any case pending in a federal court. The United States, through the Department of Justice Antitrust Division and the United States Patent and Trademark Office (USPTO), has a strong interest in protecting and promoting competition in the U.S.

economy, including by promoting a strong and effective patent system. The USPTO—the Executive-branch agency charged with examining patent applications, issuing patents, and advising the President on intellectual property policy through the Department of Commerce— furthers these interests by promoting the proper and consistent interpretation of the Patent Act, which protects patent rights and rewards innovation. Broadly, the United States seeks to advance consistent and correct application and enforcement of the intellectual property laws, including the Patent Act, to safeguard patents, fuel economic growth, and spur innovation to advance American freedoms. Patent rights also work with the antitrust laws to spur competition among innovators to create new and useful technologies, products, or services for consumers.

The incentive to innovate at the heart of the Patent Act is undermined when the availability of preliminary injunctions to block infringement is unduly limited. Congress has authorized injunctions "in accordance with the principles of equity to prevent the violation of any right secured by patent," 28 U.S.C. § 283, and "[i]njunctions are vital to [the patent] system" for "encouraging innovation," *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015). Without the possibility of injunctive relief, "the right to exclude granted by the patent would be diminished, and the express purpose of the Constitution and Congress, to promote the progress of the useful arts, would be seriously undermined." *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1577-78 (Fed. Cir. 1983) (abrogated on other grounds by *eBay Inc. v. MercExchange, L.L.C.*,

49

547 U.S. 388, 393-94 (2006), as noted in *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1148-49 (Fed. Cir. 2011)).

Chief Justice Roberts joined the majority but also penned a concurrence, writing that since "at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases." Id. at 395 (Roberts, C.J. concurring). This "long tradition of equity practice is not surprising given the difficulty of protecting the right to exclude through monetary remedies that allow an infringer to use an invention against the patentee's wishes"—a difficulty that suggests irreparable harm.

In *eBay*, the Court specifically rejected wholesale categorical rules as inconsistent with equitable principles. 547 U.S. at 393. It rejected the Federal Circuit's "general rule," unique to patent disputes, that an injunction will issue upon a finding of infringement and validity. *Id.* at 393-94. And, conversely, it rejected the district court's "broad classification" that a patentee who is willing to license could not establish irreparable harm. *Id.* at 393 … The Court noted that "some patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves." *Id.*

"The Federal Circuit has also held that "[e]ven without practicing the claimed invention, the patentee can suffer irreparable injury." *Presidio*, 702 F.3d at 1363. In Broadcom, 543 F.3d at 703, for example, the Federal Circuit held that the plaintiff "provided evidence of irreparable harm, despite the fact that it does not

currently practice the claimed inventions" and had licensed the patents to another entity, and the court found irreparable injury and lack of an adequate legal remedy based on the difficulty of calculating monetary damages in a competitive "design-win" market. *Id.* The Federal Circuit acknowledged that the right of a patent holder to exclude likely would be diminished if payment were the preferred remedy because "a calculating infringer may [] decide to risk a delayed payment to obtain use of valuable property without prior negotiation or the owner's permission." *Presidio*, 702 F.3d at 1362-63."

"An injunction should not be punitive and is not designed to give a patent owner undue leverage. Rather, an injunction serves "to prevent the violation of any right secured by a patent." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 772 (Fed. Cir. 1993) (quoting 35 U.S.C. § 283). The leverage that it provides depends on the value of the patent: If there are equally good non-infringing alternatives to the patented technology, then an appropriately scoped injunction will provide very little leverage. But if the invention is essential to the value of the product, the injunction will provide greater leverage in license negotiations. An appropriately scoped injunction leaves it to the parties, rather than courts, to determine the value of the technology."

## Comment on the Public Interest of the USPTO and USDOJ

81.   *AMICUS BRIEF*: "Joint Comment on the Public Interest" of the United States Patent and Trademark Office and the United States Department of

Justice"; In the Matter of Certain Dynamic Random Access Memory (Dram) Devices, Products Containing the Same, and Components Thereof; Docket No. 3854. USITC, Washington, D.C. [*Exhibit C*]

Since America's founding, the public interest has been viewed not as in tension with patent protection but instead as the core motivation for protecting inventors' exclusive rights. As James Madison noted in *The Federalist No. 43*, the utility of patent protection "will scarcely be questioned" because the "public good fully coincides … with the claims of individuals" to their inventions.

Supreme Court and Federal Circuit precedent affirms that one significant reason "the public interest . . . is dominant in the patent system" is because intellectual property protection exists "to encourage invention." These decisions reflect the American view that the enforcement of patent rights is an "issue [] of great moment to the public," including the public's interest in the "encouragement of investment-based risk."

The economic stakes of patent enforcement cannot be overstated. Intellectual property intensive industries account for approximately 40% of U.S. GDP and support tens of millions of American jobs. When patent rights are devalued through ineffective enforcement, the entire innovation ecosystem suffers. Research and development investment declines, venture capital becomes scarce for technology startups, manufacturing flees offshore, and America's technological leadership erodes. Innovation follows investment, and investment follows protection. This is why the Federal Circuit has long recognized that "the public's general interest in the judicial

protection of property rights in inventive technology" against infringement "outweighs any interest the public has in purchasing cheaper infringing products."

An exclusion order issued by the USITC resembles an injunction issued by a district court in that each can, in effect, prohibit an infringer from selling infringing articles in the United States by either injunction (district court) or exclusion order banning the articles from importation into the United States ab initio (USITC). The presumption favoring exclusion orders for patent infringement in the USITC thus appears consistent with the view that injunctions often are an appropriate remedy in district court litigation. *See, e.g., eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006) (observing that, since "at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases") (Roberts, C.J., concurring); see also Statement of Interest of the United States of America, *Radian Memory Sys. LLC v. Samsung Elecs. Co.*, No. 2:24-cv-1073, ECF No. 52 (E.D. Tex., June 24, 2025).

Public interest determinations should follow—not precede— findings on infringement and validity. The statutory structure of Section 337 clearly contemplates this sequence: first determine if there is a violation, then consider whether public interest factors justify withholding the presumptive remedy. This sequencing makes logical sense. Because "the public is best served by enforcing patents that are likely valid and infringed".

82.     The Agencies urge the Commission to reaffirm [] public interest in

enforcing [] exclusion orders that block the importation of infringing products.

## IX. RELATED LITIGATION

**Google Rejected the Affirmative Defense of Performing Work for the Government as a Third-Party Contractor in *Golden v. Google LLC* NDC Case No. 22-5246**

83.     28 U.S.C. § 1498 (a): "Whenever an invention described in and

covered by a patent of the United States is used or manufactured by or for the

United States without license of the owner thereof or lawful right to use or

manufacture the same, the owner's remedy shall be by action against the United

States in the United States Court of Federal Claims for the recovery of his

reasonable and entire compensation for such use and manufacture." 28 U.S.C. §

1498 (a)

> *For the purposes of this section, the use or manufacture of an*
> *invention described in and covered by a patent of the United States*
> *by a contractor, a subcontractor, or any person, firm, or*
> *corporation for the Government and with the authorization or*
> *consent of the Government, shall be construed as use or*
> *manufacture for the United States.* 28 U.S.C. § 1498 (a)

84.     Under 28 U.S.C. § 1498 (a); "[t]o succeed on an implied authorization

theory there must be some explicit government action, such as a contracting

officer's instruction, or evidence extrinsic to the contract language showing the

government's intention to assume liability. *Va. Panel*, 133 F.3d at 870; *Larson*, 26 Cl. Ct. at 370.

85.     In *Larson v. United States*, the Claims Court recognized that implied authorization "may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement." *Larson*, 26 Cl. Ct. at 370 (citing *Bereslavsky v. Esso Standard Oil Co.*, 175 F.2d 148, 150 (4th Cir. 1949); *Carrier Corp. v. United States*, 534 F.2d 244, 247–50 (Ct. Cl. 1976); *Hughes*, 534 F.2d at 897–901).

86.     In *FastShip, LLC v. United States*, decided on June 5, 2018, the United States Court of Appeals for the Federal Circuit (CAFC) defined the term "manufactured" pursuant to 28 U.S.C. § 1498. The statute states that a patent owner can sue the U.S. government for infringement when "an invention [covered by a U.S. patent] is used or manufactured by or for the United States without proper license ... or lawful right to use or manufacture...". *FastShip* sued the U.S. government for patent infringement in the United States Court of Federal Claims pursuant to § 1498.

87.     In its opinion, the CAFC in *FastShip* stated that no controlling cases existed on the issue of the definition of "manufactured" pursuant to § 1498. Therefore, based on its plain meaning, the CAFC concluded that "a product is

'manufactured' when it is made to include each limitation of the thing invented and is therefore suitable for use".

88.    According to the contracting officer instructions or specifications or drawings which impliedly sanction and necessitate infringement" *Hughes Aircraft Co.*, 534 F.2d at 901, that the Government [DoD-DTRA]; in its Broad Agency Announcement on 05/07/2019; Defense Threat Reduction Agency BAA Call CBI-01 HDTRA1-19-S-0005 Chemical / Biological Technologies; the DoD-DTRA is requesting in the solicitation's specifications, "ATAK, WinTAK, and WebTAK, and also iTAK that is:

• Software that is fully documented and easy to access, modify, and extend (modular)
• Application with a robust data management approach, supporting easy retrieval/sending
• Software that is able to comply with DoD standards for authorization to operate
• Software that is tested and verified. Mobile applications for lightweight and transportable devices such as smartphones and tablets, that enable the Warfighter to operate under the threat of Chemical and Biological threats.

| ATAK | | | |
|---|---|---|---|
| Google Pixel 5 Smartphone | Samsung Galaxy S21 Smartphone | LG V60 ThinQ 5G Smartphone | Qualcomm Smartphone/ Snapdragon Insiders |

|  |  |  |  |
|---|---|---|---|

The Android Tactical Assault Kit (ATAK) is built on the Google Open-Source Operating System platform. ATAK has a CBRNE plugin architecture. ATAK is built on Google's android open-source operating system. Draper Laboratory, Inc. is responsible for providing the CBRNE plugin sensors [hardware]. Also, the ATAK itself has various end-user versions: ATAK - Civilian (ATAK-CIV); ATAK - Government (ATAK-GOV); and, ATAK - Military (ATAK-MIL) [software]

- Google bought Android Inc. for USD 50 million in 2005.
- Android became the leading mobile operating system in 2014 and reached 1 billion users within a year, marking one of the fastest adoption cycles in technology history.
- The total number of Android users worldwide reached 3.9 billion, as the most widely used mobile OS.
- Android captured 73.9% of the global mobile OS market, reinforcing its dominance worldwide.
- Android accounted for 42.51% of the US mobile OS market, showing a sizable but competitive position.
- Samsung dominated Android device shipments with 30.8% of the vendor market share; Xiaomi ranked second.
- In the United States, about 60% of smartphone owners use an Android device.
- The global smartphone market is expected to grow from $510 billion in 2022 to about $876 billion by 2032, with an annual growth rate of 5.7% from 2023 to 2032.

- As of 2024, about 3.3 billion people worldwide use Android devices, which has 71.74% of the global market for mobile operating systems.

- Samsung holds 30.8% of global Android shipments, making it the largest Android smartphone vendor and the strongest driver of overall Android device volume.

- More than 3.9 billion people are using Android in 2025, demonstrating the operating system's widespread adoption worldwide.

- iOS is only available on Apple devices, whereas many manufacturers, including Samsung, Google, and OnePlus, use Android.

## Twelve Federal Judges Repeatedly Rejected Complainant's Arguments that Google's Alleged Infringing Use is that of a Patented Method or Process

89.    The use of an infringing device/apparatus typically refers to the utilization of devices or systems that violate intellectual property rights, particularly patents. This can lead to legal consequences for Google. Using an device/apparatus that incorporates Complainant's patented technology without permission constitutes patent infringement.

90.    Case law appears obvious: "[T]he use of a patented invention, without either manufacture or sale, is actionable." "The inventor of a machine [device/apparatus] is entitled to the benefit of all the uses to which it can be put, no matter whether the inventor had conceived the idea of the use or not."

91.    Rules governing use infringement depend on the nature of the claim-in-suit. Infringing use of a patented method or process is fundamentally different from infringing use of a patented system or device. For example, a rule that governs infringement of a method claim may not govern infringement of an apparatus claim.

92.    The critical factor for determining which type of use infringement has occurred is whether the patent claim covers a process and not the apparatus itself used to implement that process.

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

93.    "[A]pparatus claims cover what a device is, not what a device does." Any use of a device that meets all of the limitations of an apparatus claim clearly

infringes. Mere possession of a product covered by a subsequently issued patent, however, does not infringe until the product is used, sold or offered for sale.

94.     A process, however, is a different kind of invention. It consists of acts or steps, rather than tangible things. A process, therefore, has to be carried out or performed. Thus, a process/method claim is directly infringed only if each step of the claimed method is performed.

95.     Importantly, the sale of an apparatus capable of performing the patented method is not a sale of the method. A method claim is directly infringed only by the entity usurping the patented method.

96.     *The United States Court of Appeals for the Federal Circuit Judges in Golden v. Google, LLC, Case No. 22-1267; determined Direct Infringement by or for the Government, arises when there's a combined ATAK Software; CBRN Plugins; CPU; and [Google] Smartphone*

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court ***again*** concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim

limitations to infringing product features, and it does so in a relatively

straightforward manner. We conclude that the district court's decision in the

Google case is not correct with respect to at least the three claims mapped out in

the claim chart. Mr. Golden has made efforts to identify exactly how the accused

products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267

examined and determined Golden has described how the Google "smartphone",

that include the ATAK software and CBRN plugin sensors literally infringes at

least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim

1 of Golden's '189 Patent.

97.     *The United States Court of Appeals for the Federal Circuit Judges in*
*Golden v. Samsung Case No. 23-2120; agreed with the Northern District of*
*California Court Judge in Golden v. Samsung that Direct Infringement by or for*
*the Government arises when there's a combined ATAK Software; CBRN Plugins;*
*CPU; and [Google] Smartphone*

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document

28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge

and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones

possess that claimed detector/sensor functionality on three alternative bases: (1)

through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the

Android operating system," involves "plug-ins" and "app specific software," was

"[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

98.    *The Northern District of California Court Judge Haywood S. Gilliam, Jr. in Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and [Google] Smartphone*

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order

Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23;

the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant

[Google] that the Google Pixel devices could only infringe Golden's asserted

patents if a user were to add the additional ATAK application and CBRN plugins.

99.    *The Northern District of California Court Judge Rita F. Lin in Case No. 22-5246; determined Direct Infringement by or for the Gov't arises when there's a combined ATAK Software; CBRN Plugins; CPU, and [Google] Smartphone*

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order

Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68

Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant

[Google] that the Google Pixel devices could only infringe Golden's asserted

patents if a user were to add the additional ATAK application and CBRN plugins.

100.    *The United States Court of Appeals; Federal Circuit Judges in Golden v. Google, LLC, Case No. 24-2024; determined infringement occurs when a [Google] mobile, consumer, or cellular device is integrated with, or interconnected to, Draper's CBRNE detection capability.*

In *Golden v. Google LLC.*, Case No. 24-2024, Dkt. 41; filed 06/25/2025,

three Federal Circuit judges again confirm, infringement of Plaintiff's patented

CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

## The Use of Complainant's Claimed System Under Section 271(a)

101.    In *NTP, Inc. v. Research in Motion, Ltd.* the Federal Circuit addressed issues related to system use infringement and came out a different way. A system comprises multiple distinct components that are effective only when used as a whole. Addressing whether an infringing use of the accused system occurred in the United States, the court wrote, "*The use of a claimed system under section 271(a)*

*is the place at which the system as a whole is put into service, i.e., the place where*

*control of the system is exercised and beneficial use of the system obtained.*"

102.    Finding infringement, the court concluded that use of the system as a whole occurred when the defendant's customers sent and received messages in the United States. Unlike method claims, courts analyze the invention as a whole to determine where the claimed system as a whole is put into service, and do not focus on the situs of use of each claimed element within the claimed invention.

103.    *Centillion Data Systems, LLC v. Qwest Communications Int'l, Inc.,* turned on what constitutes use of a system or apparatus claim under § 271(a). The court had never directly addressed the issue of infringement for use of a system claim that includes elements in the possession of more than one actor. The court defined the term, however, in a very similar scenario in NTP. Relying on NTP, the court decided that use of a system required the infringing party to put the invention into service, i.e., control the system as a whole and obtain benefit from it.

104.    Twelve Federal Judges rejected Complainant's argument that Google allegedly infringed Complainant's patented process, and agreed infringement occurs when a mobile, consumer, or cellular [device/apparatus] is integrated with, or interconnected to, a CBRNE detection capability. The twelve Federal Judges analyzed Complainant's patented communicating, monitoring, detecting, and controlling (CMDC) device (i.e., apparatus) as a whole to determine where the

claimed "sensing" device as a whole is put into use or service. The twelve Federal

Judges agreed to the infringement of Complainant's CMDC device as a whole.

105.    Related Litigation: United States District Court for the Western

District of Texas in *Golden v. Google LLC.* Case No. 25-0434.

## X. RELIEF REQUESTED

106.    Golden respectfully requests that the Commission:

(a) Institute an investigation pursuant to Section 337 of the Tariff Act of

1930, as amended, 19 U.S.C. § 1337, with respect to Google's violations of

that section arising from the importation into the United States, sale for

importation, and/or the sale within the United States after importation of

Google products—the Google Pixel 6, 6a, 6 pro, 7, 7a, 7 pro, 8, 8 pro, 9, 9

pro, 10, 10 pro, and Fold smartphones—that includes the Google Tensor

CPU/Chipset, and the Google Megapixel Cameras; all allegedly infringes

one or more claims of the Asserted Patents;

(b) Schedule and conduct a hearing pursuant to Section 337(c) for the

purposes of (i) receiving evidence and hearing argument concerning whether

there has been a violation of Section 337, and (ii) following the hearing,

determining that there has been a violation of Section 337;

(c) Issue a permanent limited exclusion directed to products manufactured, imported, sold for importation and/or sold after importation by or on behalf of Google, its subsidiaries, related companies, and agents pursuant to 19 U.S.C. § 1337(d) excluding entry into the United States of Google products that infringe one or more claims of the Asserted Patents, including, for example, the Google Pixel 6, 6a, 6 pro, 7, 7a, 7 pro, 8, 8 pro, 9, 9 pro, 10, 10 pro, and Fold smartphones; plus the Google Tensor CPU/Chipsets and the Google Megapixel Cameras, that are native to the Google smartphones before shipment or importation;

(d) Issue a permanent cease and desist order pursuant to 19 U.S.C. § 1337(f) prohibiting Google, its domestic subsidiaries, related companies, and agents from engaging in the importation, sale for importation, marketing and/or advertising, distribution, offering for sale, sale, use after importation, sale after importation, and other transfer within the United States of Google products that infringe one or more claims of the Asserted Patents, including, for example, the Google Pixel 6, 6a, 6 pro, 7, 7a, 7 pro, 8, 8 pro, 9, 9 pro, 10, 10 pro, and Fold smartphones, and the Google Megapixel Cameras; and the Tensor CPU/Chipset that is embedded in each of Google smartphones;

(e) Impose a bond upon importation of Google products that infringe one or more claims of the Asserted Patents, including, for example, the Google Pixel 6, 6a, 6 pro, 7, 7a, 7 pro, 8, 8 pro, 9, 9 pro, 10, 10 pro, and Fold smartphones, and the Google Megapixel Cameras; and the Tensor CPU/Chipset that is embedded in each of Google smartphones; during the 60-day Presidential review period pursuant to 19 U.S.C. § 1337(j); and

(f) Issue such other and further relief as the Commission deems just and proper under the law, based on the facts determined by the investigation and the authority of the Commission.

Dated: November 30, 2025

Respectfully submitted,

*/ Larry Golden*

Larry Golden
740 Woodruff Road #1102
Greenville, S.C. 29607
Tel.: (864) 992-7104

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## WASHINGTON, D.C.

In the Matter of

**CERTAIN SMARTPHONE DEVICES AND**

**COMPONENTS, THEREOF**

**INVESTIGATION No. 337-TA-_____**

## VERIFICATION

I, Larry Golden, Patent Owner, verifies on behalf of Complainant, that to the best of my knowledge, information, and belief, and based upon a reasonable inquiry under the circumstances, I hereby certify that:

1. The allegations contained in the Complaint are well grounded in fact and have evidentiary support, or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;
2. The claims and other legal contentions set forth in the Complaint are warranted by existing laws or by a good faith, non-frivolous argument for extension, modification, or reversal of existing law, or by the establishment of new law; and
3. The Complaint is not being filed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Dated: November 30, 2025

Respectfully submitted,

*/ Larry Golden*

Larry Golden
740 Woodruff Road #1102
Greenville, S.C. 29607
Tel.: (864) 992-7104