FILED
December 29, 2025
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____ lad
                    DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>GOOGLE LLC<br><br>　　　　Defendant. | CASE NO: 6:2025cv00434-LS<br><br>**JURY TRIAL DEMANDED**<br><br>**(Infringement under 35 U.S.C § 271(g)**<br>**(Joint Patent Infringement)**<br>**(Direct Patent Infringement),**<br>**(Willful Patent Infringement),** |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO TRANSFER**

December 24, 2025

## THE NORTHERN DISTRICT OF CALIFORNIA COURT VIOLATED PLAINTIFF'S SEVENTH AMENDMENT RIGHT

The Northern District of California (NDC) Court in cases of *Golden v. Google*; *Golden v. Apple*; *Golden v. Samsung*; and *Golden v. Qualcomm* violated Plaintiff's guaranteed right to a trial by jury in claims of patent infringement which are issues-of-facts [U.S. CONS'T 7th amend.] Plaintiff begged in each one of the cases for a jury trial, but was never told why Plaintiff wasn't entitled.

Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff is only required to alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

Plaintiff alleged facts in *Golden v. Google* that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff also plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant [Google] is liable for the misconduct alleged."

The Federal Circuit in *Bot M8 LLC v. Sony Corporation of America, et al.*, No. 2020-2218 (Fed. Cir. July 13, 2021), explained that [P]laintiff need not "prove its case at the pleadings stage" and is not required to plead infringement on an element-by-element basis. It held that, while a formulaic recitation of the elements would not be acceptable, to the extent the district court adopted a blanket element-by-element pleading standard for patent infringement, that approach is unsupported and goes beyond what the Supreme Court articulated in *Iqbal* and *Twombly*. The Court explained that it is enough "that a complaint places the alleged infringer [Google] on notice of what activity . . . is being accused of infringement."

The Court outlined several factors that would influence the level of detail required for a complaint in a given case, such as (1) the complexity of the

technology, (2) the materiality of an element to practicing the asserted claim(s), and (3) the nature of the allegedly infringing device. Applying this clarified standard, the Court found *Bot M8's* allegations regarding the '988 and '670 patents sufficient to survive a motion to dismiss [added: a "motion to dismiss" from Google, Apple, Samsung, and Qualcomm].

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 stated: "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features … Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit also, in *Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors allegedly infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

When this case was reversed and remanded back to the district court; the issues-of-facts that was outlined by the Federal Circuit "guarantees" Plaintiff a trial by jury. [U.S. CONS'T 7th amend.]

Therefore, it would be extremely prejudicial to transfer Plaintiff's case back to the Northern District of California (NDC) Court; a Court that demonstrates it still practices the Supreme Court decision in the *Dred Scott* case: "no slave or

formal slave [African American or Black] has the right to sue a White in a court of law over property, because he is property himself".

The NDC Court violated Plaintiff's Seventh Amendment right; civil rights and civil liberties; and due process of law. Plaintiff believes himself to be a victim of the NDC Court practice of "systemic and structural racism". Plaintiff also believes he will never receive a fair trial in the NDC court.

## VERTICAL STARE DECISIS

In Google's motion to transfer, Google repeatedly stated the reason for transfer is because they would like for the Northern District of California (NDC) Court to clarify their Opinion(s). In other words, Google would like to transfer the case; and retry the case because Google don't like the Judges' rulings.

Google ran on the defense theory of non-infringement because Google believed the accused Google devices had to be "*modified*" in order to infringe.

Twelve Federal Judges agreed with Google and the other OEMs and derived by reasoning or concluded from evidence [inferred] to say: "infringement of Plaintiff's CMDC device occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Plaintiff agrees, the Google cell phone was *"modified"* to include multiple CBRNE-H detection capabilities. Google's cell phone modification allegedly infringes at least claim 23 of Plaintiff's '439 patent of a "new, improved upon, and useful—cell phone":

>23. A cell phone comprising:
>   a central processing unit (CPU) for executing and carrying out the instructions of a computer program;
>   a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone

detection device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and

whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver;

wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological

sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone.

Google begin the modification of its cell phones, and participated in the modification of Apple, Samsung, LG, and Qualcomm's cell phones under an implied "authorization or consent" of the Government to *"modify"* cell phones to include a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Biological and Chemical Sensing* initiative.

Under normal conditions, other than the NDC Court, a product would have to undergo a significant change to qualify as *"modified"*. But, in this case, the Google *"modified"* cell phone would have to undergo a significant change *NOT* to be capable of detecting for CBRNE-H. By design, the Google *"modified"* cell phone was made to detect for CBRNE-H.

The Google *"modified"* cell phone is made by Google to include a camera, before importation or shipment and before any use of the phone by a third-party; capable of detecting for CBRNE-H in at least three ways: 1- Microscopic (zoom) technology; 2- QR reader technology; 3- Megapixel count for captioning images.

Even if Google wants to claim there was a significant change or modification to the Google accused products post shipment, importation, or sell; the change or modification is covered in claim 23 of Plaintiff's '439 patent, and is confirmed at the Patent Trials and Appeals Board (PTAB) in the *Department of Homeland Security v. Larry Golden* for the construed term "built-in, embedded".

23. A cell phone comprising:

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

"In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below:

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them.
We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms."

There's nothing Google needs to go back to the NDC Court to clarify. Google campaigned on modification and got what they asked for, an improper dismissal.

But, when the twelve Judges added, "the accused devices will have to be modified in order to infringe Plaintiff's patent"; "infringement does not occur without modification, the modification of the Google accused devices"; and "the Google accused devices will have to be modified in order to function as a sensing device", the Judges derived by reasoning or concluded from evidence: "infringement of Plaintiff's CMDC device occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability."

Transferring the case back to the NDC court is simply a waste of time. Nine of the twelve Judges are Federal Circuit Judges who derived by reasoning or concluded from evidence: "infringement of Plaintiff's CMDC device occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability."

Which means, if the NDC Court changes its rulings, the NDC Court would be in violation of the doctrine of *"vertical stare decisis"*. Vertical Stare Decisis simply means the lower Northern District of California (NDC) Court is bound by the decisions of the higher United States Court of Appeals for the Federal Circuit, who derived by reasoning or concluded from evidence: "infringement of Plaintiff's CMDC device occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability."

### DISTANCE TO THE SAN FRANCISCO COURT IS A GREATER BURDEN ON PROSE PLAINTIFF

Driving distance from Greenville, SC to San Francisco, CA is an estimated 2622 miles. It's an estimated 40 hours 46 minutes' drive by car. Flight distance is approximately 2221 miles and flight time from Greenville, SC to San Francisco, CA is an estimated 04 hours 28 minutes.

Even if the distance is 22 miles for the Defendant, witnesses, and experts, it's no comparison to the 2622 miles Plaintiff will have to travel to pick a jury and attend trial. 22 miles is 2600 less than what Plaintiff is expected to travel. Because 22 miles is less than 1% of the estimated 2622 miles Plaintiff is expected to travel from Greenville, SC to San Francisco, CA, it is fair to say that in comparison, Defendant travel 0 (zero) miles to the San Francisco court.

Driving distance from Greenville, SC to Waco, TX is an estimated 974 miles. It's an estimated 14 hours 57 minutes' drive by car. Flight distance is

approximately 882 miles and flight time from Greenville, SC to Waco, TX is an estimated 1 hour 46 minutes.

The driving distance for Plaintiff from Greenville, SC to Waco, TX is approximately 1648 miles less than the driving distance for Plaintiff from Greenville, SC to San Francisco, CA.

Driving distance for Defendant from San Francisco, CA to Waco, TX is an estimated 1757 miles. It's an estimated 28 hours 5 minutes' drive by car. Flight distance is approximately 1497 miles and flight time for Defendant from San Francisco, CA to Waco, TX is an estimated 3 hours 00 minutes. Transferring the case to the Northern District of California (NDC) Court places a tremendous burden on the ProSe Plaintiff. Keeping the case in Waco, TX decreases the burden of travel distance and time for ProSe Plaintiff, while obligating the multi-billion-dollar Defendant to do some traveling, above zero.

### GOOGLE'S CASH RESERVE

Google brags about its cash reserves but poor mouth about being able to afford travel for witnesses and experts. "Google's massive cash reserves are a fascinating topic. The company has a staggering $121 billion in cash and cash equivalents, which is more than the GDP of many countries. This enormous cash hoard allows Google to invest in new projects, acquire other companies, and weather financial storms". https://www.cgaa.org/article/google-cash-reserves

Across Big Tech, cash conveys power – enabling market leaders to snap up startups and steer the future of technology. How does Google's monetary muscle compare against rival tech titans?

- Google – $118 billion
- Microsoft – $111 billion

- Apple – $62 billion
- Meta – $53 billion

For perspective, Google could acquire American industrial giants like Boeing or Deere & Company outright with the over $100 billion in its coffers. Crunching the numbers further:

- Google alone holds 29% of the total $400 billion cash pile held by Microsoft, Apple, Meta and itself
- Alphabet's cash reserve constitutes nearly 6% of all cash held by S&P 500 companies

This staggering weight of money propels Google's market value over the $1.6 trillion mark – cementing its status as one of the world's most valuable firms. https://www.historytools.org/companies/how-much-cash-does-google-really-have

But yet Google complains that it will inconvenience them to have to pay witnesses and experts. Compare that to the ProSe Plaintiff, who maintains an average of $4000 dollars in his bank account and is living off social security.

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(M) 8649927104

Email: atpg-tech@charter.net

## **VERIFICATION**

## **Pursuant to 28 U.S.C. § 1746**

I, Larry Golden, over the age of 18, competent to testify, and having firsthand knowledge of the facts stated herein, do hereby declare, certify, verify, affirm, and state under penalty of perjury under the laws of the United States of America, that the foregoing statements are true, correct, and complete to the best of my understanding, knowledge, and belief, and made in good faith.

Executed and signed this 24th day of December, 2025, with all rights reserved and without recourse and without prejudice; is this "verification" for "Plaintiff's Response to Defendant's Motion to Transfer

*s/ Larry Golden*

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-992-7104

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 24th day of December, 2025, a true and correct copy of the foregoing "Plaintiff's Response to Defendant's Motion to Transfer", was served upon the following Defendant via e-mail:

>Brian C. Banner (State Bar No. 24059416)
>Valerie Barker (State Bar No. 24087141)
>SLAYDEN GRUBERT BEARD PLLC
>401 Congress Avenue, Suite 1650
>Austin, Texas, 78701
>+1 (512) 402-3569
>+1 (512) 402-6865
>facsimile bbanner@sgbfirm.com
>vbarker@sgbfirm.com

>s/ *Larry Golden*
>Larry Golden, Pro Se
>740 Woodruff Rd., #1102
>Greenville, South Carolina 29607
>atpg-tech@charter.net
>864-992-7104

